## Piercy, et al. v. Louisville & Nashville Railway Company, et al.

(Decided March 23, 1923.)

Appeal from Jefferson Circuit Court (Chancery Branch, Second Division).

1. Master and Servant—Order Affecting One Run Held not Modification of Seniority Rights of Conductors.—An order, entered by a railway company at the instance of its conductors, affecting only

one run, and the assignment of conductors thereon, was not a general change or modification of the contract with its conductors prescribing seniority rights.

2. Master and Servant—Ambiguous Contract can be Given Meaning Given it by Parties.—Where a contract providing for seniority rights of railroad conductors in interdivisional service was so ambiguous, uncertain, and remote that its meaning might not be readily discerned, the courts will give to it such meaning as the parties themselves had given to it in operation or acting under it.

3. Master and Servant—Interdivisional Rule Held Construed by Parties as Contended for by Plaintiff.—A railroad rule governing interdivisional runs, which prescribed that conductors on districts involved would exercise seniority on the mileage percentage basis, based on miles run over each seniority district, is so ambiguous that it will be given the construction adopted by the parties as requiring the conductors for such runs to be selected from the divisions included therein, in numbers proportioned to the percentage of mileage of the run in each division, the conductors of each division to be selected by seniority in their own divisions.

4. Trade Unions—Officers are not Agents of Members With Respect to Individual Rights.—The officers of trade unions are not to be deemed the agents of the members of the unions with respect to the individual rights of the members, since the purpose of the union is primarily to procure agreements with employers for the benefit of the members of the union, and not to affect the rights of the members secured by such agreements.

5. Trade Unions—Cannot Deprive Members of Individual Rights Under Agreements Secured by it.—A trade union is not the agent of a member for the purpose of waiving any personal right he may have, but only for the limited purpose of securing for him, together with all other members, fair and just wages and good working conditions.

6. Trade Unions—Agreement to Abide by Rules Does not Require Submission of Controversey Involving Personal Rights.—An agreement by a member of a trade union to abide by its by-laws, rules and regulations, and to comply with the will of the lawfully constituted majority, does not require a member to submit to the determination of the union any question involving his personal rights.

ARTHUR BENSINGER and J. VERSER CONNER for appellants.

BRUCE, BULLITT & GORDON, GROVER G. SALES and DAVID R. CASTLEMAN for appellees.

OPINION OF THE COURT BY TURNER, COMMISSIONER— Affirming.

This appeal involves the seniority rights of a conductor on the Louisville & Nashville Railroad.

Appellee Stanfill was for many years prior to 1922 an employe of that company, and for fifteen years or more had operated as passenger conductor a fast daylight train running between Cincinnati, Ohio, and Knoxville, Tennessee, known as number 32-33.

The company operated between those points three regular passenger trains each way each day; the through fast daylight train (number 32-33) one each way, a local daylight train running each way (number 37-38), and a night train each way number 31-34. The daylight fast train is regarded as the most desirable assignment and for reasons not necessary to point out it manifestly is.

This fast daylight run (number 32-33) had been assigned to and operated by Stanfill for many years before there were what are known as seniority rights recognized or provided for between the Louisville & Nashville Railroad Company and its employes.

In 1916 there were certain modified seniority rights recognized and provided for by an agreement between the company and its employes, but for the first time full seniority rights were provided for during the period of federal control of railroads, and the contract so made with the federal authorities was thereafter on March 1, 1920, ratified, approved and adopted by the Louisville & Nashville Railroad.

That contract provides: "Seniority of conductors will date from the date of examination, employment or re-employment on their respective seniority districts;" and "All permanent vacancies, including new runs, shall be advertised or bulletined for ten days before assignments are made; the senior conductor making application shall be given preference—fitness and ability to govern—on their respective divisions to such vacancies or runs."

From these provisions it is perfectly plain that the seniority rights ordinarily were intended to apply to the seniority districts, which seniority districts were coextensive with the several divisions of the Louisville & Nashville Railroad. The passenger trains referred to between Cincinnati and Knoxville operated over two divisions of the Louisville & Nashville Railroad, the Kentucky division from Cincinnati to Corbin, Kentucky, and the Knoxville division from Corbin to Knoxville. The mileage from Cincinnati to Corbin is sixty-four per cent

of the distance from Cincinnati to Knoxville and the mileage from Corbin to Knoxville is thirty-six per cent of such distance. So that these passenger trains operating between Cincinnati and Knoxville were engaged in what is known as interdivisional service.

As to this interdivisional service the contract of seniority provides: "When runs are operated over two or more seniority districts, conductors on districts involved will exercise seniority on the mileage percentage basis, based on miles run over each seniority district," and this controversy revolves around an interpretation of this latter provision.

For some years prior to the contract of March 1, 1920, and thereafter up to January, 1922, on these interdivisional passenger trains from Cincinnati to Knoxville there were employed six conductors from the Kentucky division and three from the Knoxville division, it requiring nine conductors to operate these trains because of the necessary rest period or "lay-off" on account of the length of the run. Of these nine conductors three were assigned to train number 32-33, the fast daylight passenger train, three were assigned to the local daylight passenger trains and three to the night passenger trains. Of the three assigned to the fast daylight train (32-33) two were from the Kentucky division and one from the Knoxville division, and that one was appellee, Stanfill, who was the senior conductor on the Knoxville division.

Stanfill is a member of a subordinate lodge or subdivision of the Order of Railroad Conductors, organized on the Knoxville division, and when he was placed on this through run his residence was at that end of the line; but his lay-overs being at the other end of the line he changed his residence and removed his family to Covington so that his periods of rest might be spent at his home.

In 1921 there was an agitation in the Order of Railroad Conductors, or the subdivision of that order involved on these two divisions, looking to such a change in the administration of these trains as would enable those conductors assigned on these runs from the Knoxville division to spend their "lay-over" or rest period at that end of the line. To this action Stanfill strenuously objected, he at the time being a member of the Knoxville subdivision of the Order of Railroad Conductors, and it appears that for the time being the agita-

tion stopped. But the same was renewed in the fall or winter of 1921 and finally, in January, 1922, the railroad company in response to requests from the Order of Railroad Conductors entered an order the effect of which was, as to Stanfill, to transfer him as conductor from the desirable daylight run which he had had for a number of years, and to which his seniority entitled him, to the night run between Cincinnati and Knoxville. This order appears on its face to have been made by the railroad company, "on request of the conductors," but in fact it was made in response to requests from the Order of Railroad Conductors, which requests were earnestly objected to by Stanfill upon the ground that it operated to deprive him of his seniority rights under the contract. Neither in the order making this change, nor in this record, is there a suggestion of any other reason for the entry of this order. In fact the railroad company, which is a party to this action, appears to be wholly neutral in this controversy as between the conductors involved, and has filed no answer, and has filed no brief in this court.

In this action by Stanfill against the railroad company and the other conductors involved, under the provisions of the declaratory judgment act, the lower court held there was a valid and binding contract between Stanfill and the railroad company entitling him to continue as conductor on the train 32-33, and that plaintiff was entitled to be restored to his assignment as conductor on those runs; but the judgment is declared to affect only the question of plaintiff's seniority rights and their application, and not to have the effect to interfere with any future determination by the railroad company of any question of fitness or ability of the plaintiff, or any of its other employes, to perform the duties attached to any part of the service. To this judgment the railroad company did not except, but certain of the conductors have prosecuted this appeal and Stanfill and the company are the appellees.

The first controlling question is whether the company under the terms of the quoted contract has the right when there is no question of fitness or ability involved to make an administrative order for no reason involving the efficiency of the operation of its railroad and for the only reason that it has been requested by the Order of Railroad Conductors, which order operates to deprive a conductor of his seniority rights vouchsafed to him by the terms of the contract.

The provision of the contract dealing with interdivisional runs by its very terms contemplates some sort of seniority on such runs when it says:

"Conductors on districts involved will exercise seniority on the mileage percentage basis, based on miles run over each seniority district."

We confess our inability to see or understand with any degree of clearness or accuracy exactly what this language does mean, but that it does contemplate there shall be some sort of right of seniority on these interdivisional runs there can be no question. If it means that such seniority shall apply as between the conductors of the divisions assigned to a given run in proportion to the mileage over the divisions traversed, then the two Kentucky division conductors assigned to this run were entitled to operate approximately two-thirds of the mileage on that fast run and the one conductor assigned thereto from the Knoxville division something more than the other one-third. On this basis Stanfill was entitled to a continuous run as one of the three conductors so operating the fast train, he at the time being the senior conductor assigned to those trains from the Knoxville division.

But it is argued not only that in this interdivisional service there is no question of seniority, but that the agreement which it is claimed the company and the Order of Railroad Conductors entered into changed this right of seniority which appears to have been provided for in the interdivisional service. We cannot assent to that. The action taken by the company at the instance of the Order of Railroad Conductors merely affects this run and the assignment of conductors thereon, and does not appear to have been considered either by the company or the Order of Railroad Conductors as being a general change or modification of the contract. On the contrary, so far as this record discloses, it was only an order made by the company not for any administrative purpose, not because of any unfitness or lack of ability upon the part of Stanfill, not to bring about a more efficient operation of the railroad in the interest of the public, but merely because the Order of Railroad Conductors had requested that this thing be done, even though that Order and the company knew at the time it would operate to deprive Stanfill of his seniority rights under the contract.

These seniority rights provided for in interdivisional service are provided for in such an ambiguous, uncertain and remote manner as that we must be driven to a well known rule of interpretation in ascertaining what was meant thereby. That rule is that when the language of a contract is so remote, uncertain and ambiguous as that its meaning may not be readily discerned, the courts in interpreting it will give to it such meaning as the parties themselves have given to it in operating or acting under it, and we may without exaggeration say there is in interpreting such ambiguous writings no safer rule for the courts to follow.

Guided by that rule, we have for a long number of years before the seniority rights became effective these trains operated by six Kentucky division conductors and three Knoxville division conductors; the two senior conductors on the Kentucky division were assigned to these desirable fast day trains, and the one senior conductor on the Knoxville division also assigned thereto, and we find in the operation of the other trains from Cincinnati to Knoxville two Kentucky division conductors assigned on each run and one Knoxville division conductor, and evidently they were all assigned according to their seniority. This situation continued throughout the period of partial recognition of seniority and thereafter continued during the period of full recognition of seniority.

From these admitted facts it is apparent that the quoted section has been construed by the parties acting under it to mean that inasmuch as the mileage on the Kentucky division is approximately two-thirds of the total mileage, and the mileage on the Knoxville division is approximately one-third of the mileage, and it required nine conductors to run these series of trains from Cincinnati to Knoxville over these two divisions, that there would be assigned to each pool of these trains two conductors from the Kentucky division and one conductor from the Knoxville division, and those assignments made from the respective divisions according to their seniority. Nothwithstanding this long course of conduct and action clearly showing a contemporaneous construction, by the order here complained of the three Knoxville division conductors entitled to assignments on these runs are all required to take the undesirable night runs, and the more desirable day runs are given

wholly to the Kentucky division conductors, and all this without reference to the rule of seniority.

But it is argued by appellants that Stanfill, who was a member of the Order of Railroad Conductors, as a loyal member of that organization must be bound by its action in requesting the railroad company to make the order changing the assignments.

This contention ignores the fact that such agreements between organizations of employes and their employer are designed primarily for the individual benefit of the members of the organization, and not to place it within the power of the organization to change or modify the contract at its pleasure so as to affect the individual rights of its members theretofore secured by the agreement. The officers of such organizations are, as to the individual rights of its members, not to be deemed as their agents. Here there was no general change of the contract nor was there an attempt to make a general or any change. The Order in fact did not attempt even to change the individual rights of Stanfill as to this run; but merely requested the company to ignore those rights, and the company, for the sole purpose of pleasing the organization, undertook to do so. The primary purpose in the organization of labor unions and kindred organizations is to protect their individual members and to secure for them a fair and just remuneration for their labor and favorable conditions under which to perform it. Their agreements with employers look always to the securing of some right or privilege for their individual members, and the right or privilege so secured by agreement is the individual right of the individual member, and such organization can no more by its arbitrary act deprive that individual member of his right so secured than can any other person. The organization is not the agent of the member for the purpose of waiving any personal right he may have, but is only his representative for the limited purpose of securing for him, together with all other members, fair and just wages and good working conditions. Hudson v. C. N. O. & T. P. Railway Company, 152 Ky. 711.

If the right of seniority may be changed or waived or otherwise dispensed with by the act of a bare majority of an organization to which the one entitled thereto is a member, it would be builded upon a flimsy foundation of sand which might slip from under him at

any time by the arbitrary action of the members, possibly to serve their own selfish ends in displacing him.

But it is insisted by appellants that inasmuch as Stanfill when he became a member of the organization stated he would abide by its by-laws, rules and regulations and the constitution, statutes and orders of the grand division of the order, and cheerfully comply with the will of the lawfully constituted majority, he should have submitted to the action of the order, and that he had in fact submitted to the order this controversy between him and his fellow members.

In the first place Stanfill protested at all times and at all stages of the controversy in the organization against this action upon the ground that it interfered with his right of seniority, and, in the next place, his agreement did not contemplate the submission by him to that body of the determination of any question involving his personal rights. Doubtless under the terms of his agreement as a loyal member it was his duty to acquiesce in the will of a majority inside the order upon any question of policy or any difference of opinion that might have arisen affecting the welfare of the organization. But here we have a personal right acquired by him as against the railroad company under contract, and we have the order of railroad conductors asserting the right to waive for him the benefits of that contract. It could not have been in contemplation by a member of such organization that he agreed when he entered to submit to the order for decision a controversy involving his rights as against a third party.

The case of Penn. Ry. Co. v. Reager, 152 Ky. 824, does not bear out this contention. There was an agreement in that case whereby the members of a relief association which paid benefits to its injured members, at certain rates, should finally determine the question of fact as between the member and the association as to when the injured member under its rules and regulations should no longer be entitled to benefits, and the court held that in the absence of fraud or mistake the final determination of fact by that board was conclusive. The controversy was essentially between a member and the board, and involved his right to additional benefits after a time, when the board had determined as a fact that he was no longer entitled to them. The case is clearly distinguished from this case, where by contract a member of an order had an individual right against

an employer which the order induced the employer to ignore and deny.

It may be, as contended by appellant, that the interpretation which we have given and which the lower court gave to the seniority rights in interdivisional service will, in many cases, be difficult of practical application. But we apprehend these difficulties will be solved without serious result by some change or modification as to such rights, amicably entered into by the contracting parties.

Judgment affirmed.