YAZOO & M. V. R. Co. v. MITCHELL.

(Division A.   June 10, 1935.)

[161 So. 860.   No. 31164.]

Burch, Minor & McKay, of Memphis, Tenn., and May, Sanders, McLaurin & Byrd, of Jackson, for appellant.

Watkins & Eager, of Jackson, for appellee.

Chalmers Potter, of Jackson, for appellee.

Argued orally by **C. N. Burch**, for appellant, and by Chalmers Potter and Pat Eager, for appellee.

**McGowen, J.**, delivered the opinion of the court.

The appellant, Yazoo & Mississippi Valley Railroad Company, appeals to this court from a judgment at law against it for fifteen thousand dollars damages in favor of appellee, S. S. Mitchell.

The declaration of appellee asks a recovery from the railroad company because of the wrongful loss to him of his right of seniority as a switchman employed by the railroad company in its Cherry Street Yard at Vicksburg, Mississippi, due to a merger or consolidation of two yards which it had maintained in Vicksburg prior to March 1, 1931. The Cherry Street Yard was originally established by the Alabama & Vicksburg Railway Company, which the Yazoo & Mississippi Valley Railroad leased in 1926. The Levee Street Yard was the switching yard of the Yazoo & Mississippi Valley Railroad prior to March 1, 1931. The switchmen employees of the Alabama & Vicksburg Railway were retained after that line was leased by the Yazoo & Mississippi Valley Railroad, and their seniority was observed. These employees were members of the Switchmen's Union of North America. Likewise, the seniority of the Yazoo & Mississippi Valley Railroad employees in the Levee Street Yard was observed prior to the consolidation; they were members of the Brotherhood of Railway Trainmen, a labor union with like purposes as the Switchmen's Union.

On March 1, 1931, because of the loss of business and because of decreased switching on account of the completion of the bridge across the Mississippi river, Holcomb, the general superintendent of the Yazoo & Mississippi Valley Railroad, decided to consolidate the two yards in the interest of economy, and in order, as near

as possible, to preserve the rights of the employees in the two yards. The declaration alleged that by this consolidation Mitchell was placed on the seniority list as No. 43; that by a proper construction of the rules and regulations he should have been placed upon the roster as No. 20, and that by this wrongful assignment of seniority he had been placed on the extra list for a period of six months, and not being called for work, under the rules and regulations governing the union and the railroad, he was automatically dropped from the list as an employee of the railroad; in other words, that by this method his discharge was wrongfully effected. The declaration further alleged that by virtue of the lease contract between the two railroads Mitchell's rights, under the contract between the Alabama & Vicksburg Railway and the Switchmen's Union, were preserved and assumed by the appellant; and, further, that under the union agreement with the railroad the appellant could only discharge him for just cause and upon trial, and that his seniority could not be disturbed. By seniority is meant that men who have been engaged longest in service are entitled to be called first for work by the railroad company; in other words, the employees of this particular union are called for work according to seniority, and Mitchell was employed as a switchman by the Alabama & Vicksburg Railway Company in November, 1920.

Many pleas to the declaration were filed by the railroad company, some of which were eliminated from the case by the court in sustaining demurrers thereto, and on several issue was joined. The main errors assigned by the appellant point to the refusal of the court below to grant it a peremptory instruction, but there are other assignments which do not go to the heart of the case.

Each side contends that an adverse decision to it would be destructive of the principle of collective bar-

gaining as it relates to employers and employees operating under general union contracts.

The following general contentions are made by the railroad company: (1) That under the lease contract between the Alabama & Vicksburg Railway Company and the Yazoo & Mississippi Valley Railroad Company it was specially contracted that there would be no liability by the Yazoo & Mississippi Valley Railroad Company for any contract of individual employees with the Alabama & Vicksburg Railway Company; (2) that the union labor contract between the Alabama & Vicksburg Railway and the Switchmen's Union of North America may not be enforced, because it is lacking in mutuality; (3) that the said union contract upon which the appellee relies in this case is not a contract with any individual employee and member of the union for any definite period of time, nor for any independent consideration, and, therefore, is terminable at the will of either party; (4) that Mitchell invoked the action of the various tribunals of the Switchmen's Union under its constitution and by-laws and had the benefit of the action of its own union, which was adverse to him, and that he is estopped thereby; (5) that appellee ratified and approved the action of the railroad and the constituted authorities of the Brotherhood of Railroad Trainmen and the Switchmen's Union in promulgating, in September, 1931, the roster of employees with but slight change in it from that originally promulgated by Holcomb. So far as Mitchell is concerned, the change was from No. 43 to No. 42 on the list.

Without passing upon, and eliminating, the first three contentions, we have reached the conclusion that Mitchell is not entitled to recover in this case, for the reason that he appealed to the constituted authorities of his union; their decision was against him, and he ratified their action.

A detailed statement of all the evidence in this case

and of the contents of the contract of lease between the Alabama & Vicksburg Railway Company and the Yazoo & Mississippi Valley Railroad Company, the Switchmen's Union agreement with the Alabama & Vicksburg Railway Company, and the agreement between the Brotherhood of Railroad Trainmen and the Yazoo & Mississippi Valley Railroad Company, would extend this opinion to undue length. The two union contracts with the two railroads are not different in their general tenor and purpose. In the contract with the Brotherhood of Railroad Trainmen there was provision for seniority to be calculated upon engine hours for a definite period, in the event of a merger of two or more switch yards. In the Switchmen's Union contract there was no such provision. These contracts are not unlike others which have been considered by this court; they provide, in a way, for working conditions, rates of pay, working hours, and especially for seniority. The contract between the Alabama & Vicksburg Railway Company and the Switchmen's Union provides that seniority of a switchman shall be established from the date he first performed service after employment; that switchmen laid off on account of reduction of force shall retain their seniority for a period of six months. The contract does not bind the union to furnish any member or any number of members as switchmen for the railroad, but provides that it shall remain in force until abrogated, and that to revise or abrogate the rules thirty days' written notice should be given. This contract is signed by the Alabama & Vicksburg Railway Company and by officials of the Switchmen's Union of North America.

Mitchell was chairman of the local Switchmen's Union in the Cherry Street Yard at Vicksburg. He was also a member of the Brotherhood of Railroad Trainmen until that organization expelled him after this controversy arose. It will be observed that Mitchell does not contend that the consolidation of the two yards at Vicks-

burg was a violation of any agreement, or in itself violated seniority. He alleged in his declaration that under a proper merger he would have been entitled to No. 20. In his evidence, however, he contends that the railroad deprived him of his seniority, and that at all events he was entitled originally to place No. 12 on the roster, but because of the retirement of three men at the time this controversy arose he was entitled to place No. 9, and would have been called to work daily so long as the Cherry Street Yard operated three engines; three employees being required for each engine operated. There was evidence tending to show that if the Cherry Street Yard had been operated separately, three engines per day of twenty-four hours, the men working in crews of three for eight hour shifts, would be necessary, and therefore it is argued that he would have been entitled to be called for work every day because of his seniority. He claimed that but for the violation of said contract he would have worked one thousand and ninety-five days at seven dollars and fourteen cents a day, and he now seeks recovery therefor and for future damages.

There is no evidence tending to show what work was actually done in the Cherry Street Yard after the merger, but two witnesses estimated that the work should require three engines per day. Mitchell testified that he was ready, able, and willing to work at all times, and had been engaged in other work for only a short period at eighty-five dollars per month.

On March 1, 1931, when the new roster was promulgated, Mitchell protested to superintendent Holcomb. He had a conference with the general chairman of the Switchmen's Union and with one of the vice presidents; he wrote many letters and sent telegrams, but not until he was introduced as a witness did he take the position that he was entitled to place No. 9 on the roster, notwithstanding the merger. It must be understood that the men in the Levee Street Yard had their seniority,

as well as the men in the Cherry Street Yard, and that it was impossible for the railroad to merge the two rosters and each man in the two separate yards retain his original place of seniority. After Mitchell's protest, his local union sustained his grievance; he then asked the interposition of the president of the Switchmen's Union, T. C. Cashen, who appointed Kanan, vice president, and Clohessy, vice president, to confer with Holcomb. All the letters and telegrams sent by Mitchell showed that he contended that the seniority should be assigned by referring to the engine hours of the two yards during the year 1926; the year when business was good. The railroad contended that the proper relation of the men in the two yards should be that of the relative engine hours one year prior to the merger, claiming this to be the valid and equitable adjustment of the difficult problem. Kanan represented the men of the Switchmen's Union in a conference with Atwill, the general manager of the railroad, and Bishop represented the Brotherhood of Railroad Trainmen. The general manager assured these two representatives of the two rival competing labor union organizations that he would put in operation any roster agreed upon, and they finally agreed with the general manager on the promulgation of a roster substantially the same as that which had been originally put in force by Superintendent Holcomb. Mitchell wrote a long letter to numerous railroad officials insisting that the merger be upon a fifty-fifty basis as between the men of the two yards. On the witness stand he expressed the opinion that the merger should have been on a proportion of fifty-three to forty-seven in favor of the Levee Street Yard.

After Clohessy, Bishop, and Atwill had agreed upon a roster, it was submitted to Whitney, the president of the Brotherhood of Railroad Trainmen, and to Cashen, the president of the Switchmen's Union, and approved by them. The laws of the Switchmen's Union permitted

an appeal from the decision of the president to the general convention of the union. Mitchell did not pursue this course. It is said that there was irregularity in permitting Clohessy, a vice president, to act in conjunction with the railroad and the rival organization instead of calling the general grievance committee into the conference.

Mitchell also wrote a letter to Whitney, the president of the Brotherhood of Railroad Trainmen, in which he demanded, in effect, that the approved and amended roster be put in operation. This letter was written subsequent to the approval of the roster by the union president. Mitchell explained that he wrote this letter on behalf of certain other employees interested. He contends in his evidence that Kanan promised him that he would not agree to a roster without his presence. His witness Lauret testified that Kanan promised Mitchell he would call him into the conference if he found it necessary. As far as we are able to determine, Mitchell set in motion all the gears of the machinery of his union to obtain a better place on the roster. In all the correspondence, and in all the evidence, the contention was never made by him to the railroad or to any one else that he was entitled to place No. 9 on the roster, which would have been his position had there been no merger of the two yards. The railroad had a right to merge its two yards in the interest of economy. The railroad, in fact, had a right to abolish any switching yard. There was no effort in either of the contracts to prevent merger, consolidation, or abolishment of any such yard. It was provided in the Switchmen's Union agreement that an employee could not transfer his seniority from one yard to the other. In other words, this rule means that seniority only obtained in the particular yard in which the employee worked.

It is the contention of the appellee, with reference to this state of facts, that the individual member of a union

is bound by the action of the trade union only in so far as the internal machinery, rules, discipline, and conduct are concerned, and any attempt to represent or bind the member exceeding these limits is unauthorized and not binding on the member. He cites the case of Piercy v. Louisville & Nashville R. Co., 198 Ky. 477, 248 S. W. 1042, 33 A. L. R. 322, involving the seniority of rights of a conductor on the railroad. The conductor had a good run; the railroad acceded to the request of the union, of which Piercy was a member, to change his seniority, to his detriment. He sought to be reinstated to his rights by a suit against the railroad and the union. The action of the union was not indorsed or brought about by Piercy; it had volunteered in the matter for purposes of its own. There was no necessity because of business conditions for any change in the seniority of Piercy. The lower court held that Piercy was entitled to be reinstated to his rights, and the railroad did not appeal. The union appealed, and the court sustained the decree of the lower court, and also held that such agreements between organizations of employees and their employers were not designed to place it within the power of the organization to change or modify the contract at pleasure, so as to affect injuriously the individual rights of its members theretofore secured by the agreement; that the officers of labor unions were not the agents of the members to affect their individual rights, and that a labor organization could not, by arbitrary act, deprive one of its individual members of rights secured to him by the agreement which it had made with the employer.

There is no arbitrary action in the case at bar. The record shows that everything that was done by the officers of the labor union was instigated, aided, and abetted by Mitchell. So far as the record discloses, there is nothing to show that any arbitrary or unfair action was taken either by the labor union or by the

railroad. The necessity for the consolidation of the two yards at Vicksburg was occasioned by economic conditions over which the railroad had no control, and of which it was bound to take notice; its business was declining; the building of the bridge had obviated the necessity for as much labor as had been employed theretofore. Mitchell brought about the decision of the officials of his union; he is at war with both the unions of which he was a member; he is at war with the railroad; and never, before he went on the witness stand, did he take the position that he was entitled to a specific place, or that a consolidation could not be brought about unless and until he was allowed to retain his seniority. In other words, he seems to contend that if the union's decision had been to his certain interest he would have approved it; as it was not, he reserved the right to disapprove it and sue at law.

The facts we have detailed, the letters, the telegrams, Mitchell's action and his declaration, show that he led the railroad to treat with the representative of his union on the question of a consolidation of these two yards and the seniority to be effected thereby; that they acted upon it; and that he insisted upon that action being put into operation. His excuses for the voidance of this condition are trivial and without merit, and the question of ratification presents no issue of fact. He brought about the action of his union which binds him. He did not pursue his remedy within the union by appeal to the general convention. We find no case on all fours with this in the books, nor is any cited to us.

The president of Mitchell's union testified that it had been the custom to deal with questions of this kind in this manner since the organization of the union. The only thing unfair or arbitrary about the action of the union is that Mitchell did not secure what he conceived to be an adequate adjustment of his seniority. The long custom observed by the union has been that its inter-

pretation of its own laws, so long as it does not conflict with the law of the land and transgress the bounds of reason, nor contravene public policy, is binding upon its members when such members seek action from the union. The Piercy Case would apply had the union officials volunteered their action and brought about the result complained of here. The railroad and the officials of the unions had a case in which the rights of the competing rival labor unions were involved. In that situation, the interpretation and construction of their laws must be left to such officers as are designated to act thereon. We think the facts of this case are within Donovan v. Travers, 285 Mass. 167, 188 N. E. 705, and Shaup v. Grand International Brotherhood of Locomotive Engineers, 223 Ala. 202, 135 So. 327. The action of the railroad was not arbitrary, but evinced fairness to both unions. The course pursued by the chief executives of the unions appears to us to be within the spirit of their laws.

Reversed, and judgment here for appellant.