[No. 28846. *En Banc.* October 1, 1943.]

CHARLES A. CLARK, *Appellant,* v. CLAREMONT APARTMENT HOTEL COMPANY *et al., Respondents.*[1]

[1]Reported in 141 P. (2d) 403.

*Roy H. Bullack* and *William R. Bell,* for appellant.

*Evans, McLaren & Lane,* for respondent.

STEINERT, J.—Plaintiff, Charles A. Clark, brought suit against Claremont Apartment Hotel Co., a corporation, and its managers, as defendants, to recover the difference between the wages paid him by the hotel company during a period of three years' employment and the wages which he claimed to have earned during that period by virtue of an alleged collective bargaining agreement between the hotel company and the labor union of which plaintiff was a member. In their answer, defendants admitted plaintiff's employment for the period claimed; admitted that the hotel was operated under a contract and agreement with the particular union; but denied that they had violated any of the terms of that agreement; and further alleged that the hotel company had paid the plaintiff the full amount of wages owing to him under the provisions of the agreement had with the union. In an affirmative defense, defendants alleged additionally that plaintiff had regularly accepted, without protest, the periodic checks issued to him by the hotel company in payment of the wages due him for each preceding two weeks. In his reply, plaintiff denied the allegations of the affirmative defense.

The cause was tried to a jury which, at the direction of the trial court at the conclusion of all the evidence, re-

turned a verdict in favor of the defendants. Plaintiff appealed. We shall hereinafter refer to the defendant hotel company as though it were the sole respondent.

It may be stated at the outset that, as between the respondent hotel company and the labor union of which appellant is a member, there is no divergence of view concerning the effect of the alleged collective bargaining agreement or concerning respondent's obligations thereunder. On the contrary, the union and its officers are at one with the hotel company on those questions and, likewise, so far as the record discloses, are averse to the contention made by the appellant.

The facts as shown by the evidence are these: Appellant entered the employ of the respondent, Claremont Apartment Hotel Co., on or about February 1, 1934, as assistant engineer and janitor. From that date until July 15, 1937, his agreed wage was as follows: From February 1, 1934, to April 15, 1937, $75 a month; from April 15, 1937, to July 15, 1937, $18 a week (which amounted to $78 per calendar month).

At all times hereinafter referred to, respondent was a member of Seattle Hotel Association, a voluntary association of hotels in the city of Seattle, and appellant was a member of International Union of Operating Engineers, Local No. 843. On or about June 1, 1937, Seattle Hotel Association entered into a written agreement with International Union of Operating Engineers, Locals No. 843 and 843A, covering hours, wages, and conditions of employment of certain employees of members of the hotel association. The agreement purported to cover "those members of the union employed by members of the association, and to apply to all hotels, non-members as well as members." In so far as is material here, the agreement provides:

"This agreement to be in full force and effect from June 1, 1937 to September 15th, 1938, and will continue from year to year thereafter unless one of the contracting parties notifies the other in writing ninety (90) days prior to expiration that changes are desired. . . .

"Association members [hotel operators] to have unrestricted right to hire and to discharge for cause. . . .

"No engineer shall be required to do janitor work other than the cleaning of his boiler and engine room. . . .

"The following scale of wages shall be paid during the life of this agreement. . . .

"Assistant engineers working under a chief engineer in smaller hotels, $125.00 per month. . . .

"It is mutually agreed that smaller hotels having only small heating boiler which is usually in charge of the janitor shall not be deemed a part of this agreement; however, where a man's time is fully occupied by general maintenance repair and heating he shall come under the terms of this agreement."

That agreement and all negotiations in connection therewith or relating thereto (including a subsequent oral agreement hereinafter more particularly set forth and considered) were entered into and conducted on behalf of International Union of Operating Engineers by Bert Swain, secretary and business agent of the union, and his assistant, Edgar D. Griffith. The authority of these two individuals to represent and act for the union is not questioned.

It is to be noted that the written agreement mentioned above was one between *Seattle Hotel Association* and the union, and related generally to hours, wages, and conditions of employment. Agreements between the union and the *individual hotel operators,* members of the hotel association, were matters to be subsequently arranged between the union and the respective hotel operators and were distinct from the general agreement with the Seattle Hotel Association. Such subsequent individual agreements were likewise matters in which Swain and Griffith were authorized to act for the union and involved, among other things, the proper classification of employees of the particular hotel and their rates of pay as determined by the classification. Mr. Griffith, assistant secretary of the union, testified:

"A. There being so many different classifications and sizes of hotels, it was left to me by the organization to segregate and to place these men, or the pay of the men, in what I figured was the proper place for them, the proper

classification, which I did over a matter of some possibly two months. Q. And would that apply to all the hotels or just the small ones? A. Apply to all of them. Q. All of the hotels? A. There was some that I never even went into at all. I just looked at the outside, knowing that they could not afford an engineer. Q. Then you, as a representative of the Union would make arrangements or enter into an agreement with each individual operator. Is that correct? A. As to the classification. Q. And the pay? A. And the pay of their men."

Mr. Swain, the secretary of the union, testified:

"Q. Mr. Griffith is with your Union, is he? A. Yes, my assistant. Q. And what are his duties and what is his authority? A. He negotiates agreements under my direction. Q. And does he have authority to negotiate with the Claremont Hotel? A. Yes. Q. And he negotiated with the Claremont Apartment Hotel under your directions and authority? A. Yes."

About a month after the execution of the written agreement between the union and the Seattle Hotel Association, a conference was held between Messrs. Swain and Griffith, representing the union, and Messrs. William D. Shannon and J. A. Ledward, manager in charge and resident manager, respectively, of the Claremont Apartment Hotel Co., and after considerable discussion among the four men an oral agreement was entered into between the union and the respondent hotel company fixing the wages of the hotel company's employees who were members of the particular union. By that agreement, appellant's wages were fixed at one hundred dollars a month, which, it will be noted, was an increase of twenty-two dollars a month over his former wages, but twenty-five dollars less than the amount provided in the earlier written agreement for assistant engineers. The substance of that conference and the reasons for the agreement are set forth with particularity in the testimony of Mr. Griffith, as follows:

"Q. Now, at that time was there an employee of the Claremont by the name of Charles A. Clark. Were you acquainted with Mr. Clark? A. Yes, sir. Q. Were you familiar with his position and his work at the Claremont?

A. I was. Q. And did you negotiate with the representatives of the Claremont regarding his classification and rate of pay? A. I did. Q. And what was the result of those negotiations? A. Am I permitted to give the reasons for those? Q. Yes, you can just tell the jury. THE COURT: Any discussion that was had between the respective parties. A. All right. When we first,—The first meeting I had with him [the representative, or representatives, of the respondent hotel company] almost the first thing that came up was the fact that they had two old men down there. One of them was partially incapacitated at the time. And, understand, these are their arguments, and that if they paid the scale of wages that I was asking for them that these men would have to be replaced by younger men and better men put on the job. And I was told very plainly that there would be an order in our place for two men the next day if I insisted on it. It is not my plan at any time to put any man on the street, particularly a man that is along in years and possibly somewhat incapacitated. In lieu of that fact, I agreed that the wages at the Claremont Hotel be $100.00 and $125.00 a month respectively for Mr. Clark and Mr. Kellogg. THE COURT: Just designate, if you will, who was to receive the $100.00 and who was to receive the $125.00. A. Mr. Clark was to receive the $100.00 as he was the assistant, and the man particularly involved with their arguments; and that was the reason that it was put at $100.00 for Mr. Clark and $125.00 for Mr. Kellogg. Q. Did you make an examination of the duties he performed at that time? A. Yes. I went over every hotel where we had men in, where it would come under our jurisdiction; and although I couldn't tell every duty, I took a general survey of it and know pretty nearly what was going on in each place. Q. In these various hotels, did you make an examination of their operation and their income? A. Oh, yes. Q. So you took that somewhat into consideration? A. That was taken into consideration also, and at that time it was very tough going for hotels. Q. Now, did the Claremont Apartment Hotel live up to their agreement with you? A. They did. Q. Did you have any subsequent agreement with them regarding increasing Mr. Clark's pay? A. Yes, we did. I don't know just exactly when that came up, how long it was after that; but Mr. Kellogg, and I talked with Mr. Clark, too, I believe, and things were picking up and it seemed to me that they should come up to the regular scale. Q. You mean things were picking up in the hotel business?

A. Yes. Q. And did the Claremont Apartment Hotel agree with your wishes in the matter? A. They did. They agreed to pay, and from then on went on at the regular price. Q. And they lived up to their agreement? A. Yes."

It clearly appears from the evidence that appellant's wages were fixed by the respondent and the union at one hundred dollars a month for the following specific reasons: (1) appellant was an old man, partially incapacitated; (2) his duties included very little of the mechanical work ordinarily required of an assistant engineer; (3) the financial means of the hotel company at that time were limited; and (4) had the general scale of wages of assistant engineers been insisted upon by the union, the respondent hotel company immediately would have replaced appellant with a younger and more capable man.

Appellant remained in the employ of the respondent until April 2, 1941. From July 16, 1937, to September 30, 1940, he was paid, by checks, the sum of $100 a month, as respondent had agreed with the union. Appellant testified that he made repeated protests, both to the respondent and to the union, concerning the amount of wages paid to him during that period, claiming that he was entitled to receive $125 a month; respondent's evidence, on the other hand, was just as positive that appellant accepted and retained the wage checks without protest. Although an issue of fact was thus presented on that question, it is unimportant here, for reasons which will appear later.

From October 1, 1940, to April 2, 1941, appellant was paid $125 a month, which, likewise, was the result of a definite agreement between the respondent and the union. On the last mentioned date, appellant voluntarily quit respondent's employ and obtained another job. About three months later, in June, 1941, he commenced this action to recover the amount of alleged underpayment of wages during the period between October 1, 1937, and October 1, 1940.

Appellant bases his contention upon the following chain of argument: The written agreement between the union and the Seattle Hotel Association was a collective bargain-

ing agreement, made by the union for the benefit of its members, including the appellant; in making that agreement the union acted, not for itself as principal, but, rather, as agent for the body of employees who were affiliated with the union; the execution of the agreement created individual rights flowing to the appellant and enforcible by him; after the execution of the agreement, the union, as agent for the appellant, could not change or modify its terms to appellant's detriment, without his consent.

We readily concede that the written agreement, in so far as it went, constituted a "collective labor agreement," which is a term used to describe a bargaining agreement as to wages and conditions of employment, entered into by groups of employees, usually organized into a brotherhood or union, on the one side, and an employer, or groups of employers, on the other side. For the purpose of this case, we shall also assume that in entering into that agreement the union was acting, with respect to the appellant, not as his principal, but rather as his agent. To the remainder of appellant's chain of argument, however, we do not give full assent, under the situation presented by the facts of this case and the law as we conceive it to be.

As has already been emphasized, the initial agreement, which was in writing, was one between the union and the *Seattle Hotel Association* and related generally to hours, wages, and conditions of employment with respect to certain employees in the hotel industry. However, that agreement created no definite, concrete, or final contract between any one *hotel operator* and any one member, or group of members, of the union, but merely established the terms on which *contracts of employment* between individual employing operators, on the one hand, and a group of employees, members of the union, on the other, might thereafter be proposed, considered, made, and carried out. In other words, the initial agreement merely formed the basis for future dealing between parties whose interests would be affected thereby. The initial agreement itself acquired no legal force until the parties directly and imme-

diately concerned contracted with reference to it. Until closed by specific acceptance on the part of the parties so concerned, the agreement remained incomplete. *Rentschler v. Missouri Pac. R. Co.*, 126 Neb. 493, 253 N. W. 694, 95 A. L. R. 1; 31 Am. Jur. 872, Labor, § 97.

In the absence of anything to the contrary, it might, or could, of course, be said that the written agreement would ordinarily become, by implication, a part of any simple or informal contract under which a member, or group of members, of the union should enter into the employ of some individual member of the hotel association. But that is not the situation here. When the respondent, Claremont Apartment Hotel Co., the particular employer herein, made its individual contract with the union, and through it with its union employees, the contracting parties specifically and definitely agreed that the appellant should receive a wage of one hundred dollars a month. Until that agreement was concluded, there was no existing *contract of employment* between the respondent hotel company and its employees, other than such contracts of employment as had theretofore obtained between them. Prior to the time of the oral agreement, the only contract of employment which appellant had with the hotel company was the one under which he was receiving seventy-eight dollars a month. The only final, complete, concrete agreement, whether it be considered a "collective labor agreement" or a contract of employment, between the union, acting for the employees, and the respondent hotel company, was the oral agreement now under consideration.

In passing, it may be stated that appellant does not contend that this latter agreement is invalid merely because it was not in writing. His contention is rather, that the former, *written* agreement constituted the sole collective bargaining contract between the parties here involved, and that it could not be changed without his consent. With that contention we do not agree. As we view it, the written agreement simply constituted a basis upon which the union proposed to proceed in its further negotiations with each

member of the hotel association. Its legal force, however, would, in no instance, become established until it was accepted, expressly or impliedly, by the parties contracting with reference to it. By the same token, it would not become legally enforcible at all as to any individual member of the hotel association in so far as it was inconsistent with a specific contract, whether written or oral, made directly between the union and such member of the association.

It may be admitted that the oral contract, to the extent that it was for the benefit of the appellant, could not thereafter be modified by the union, at its pleasure, to the detriment of the appellant, without his consent. But *that* contract has not been modified. On the contrary, it has been fully performed by the respondent hotel company, and that fact is recognized by the union. The appellant has not been injured by the oral contract; he has, in fact, been benefited thereby to the extent of twenty-two dollars a month. If he takes the benefit of that contract, he must likewise be governed by its limitations.

In support of his contention, appellant cites and relies principally upon the following cases: *Yazoo & M. V. R. Co. v. Webb,* 64 F. (2d) 902; *Piercy v. Louisville & N. R. Co.,* 198 Ky. 477, 248 S. W. 1042, 33 A. L. R. 322; *Gulla v. Barton,* 164 App. Div. 293, 149 N. Y. Supp. 952; *McNeill v. Hacker,* 21 N. Y. S. (2d) 432; *Christiansen v. Local 680, of Milk Drivers & Dairy Employees of New Jersey,* 126 N. J. Eq. 508, 10 A. (2d) 168.

In the *Yazoo* case, *supra,* it was held that a contract between a railroad company and the Brotherhood of Trainmen, which provided for its abrogation on thirty days' written notice, could not be annulled as to a single employee within its protection by simply giving such employee notice of reduction in pay. The reason assigned for such holding was that the provision for abrogation involved the agreement as a whole and not its application to the wages of some one employee. The facts in that case are not comparable to those presented here, for in this instance the respondent has complied fully with the terms of the

contract made directly between it and the union. In the course of its opinion in the *Yazoo* case, the court did use this language, however, which is in harmony with our theory of the case at bar:

"But in itself it [an agreement upon wages and working conditions between the managers of an industry and its employees] can rarely be a subject of court action because it is incomplete. It establishes no concrete contract between the employer and any employee. No one is bound thereby to serve, and the employer is not bound to hire any particular person. It is only an·agreement as to the terms on which contracts of employment may be satisfactorily made and carried out. It is a mutual general offer to be closed by specific acceptances. When negotiated by representatives of an organization it is called collective bargaining, but ordinarily the laws of the organization, which constitute the authority of the representatives to act, do not require the individual members to serve under it, but only that if they serve they will do so under its terms and will join in maintaining them as applied to others."

As shown above, the union and the respondent, as between themselves, never did specifically accept or agree to accept the terms of the initial contract, but, on the contrary, made a different contract with reference to respondent's employees.

In the *Piercy* case, *supra,* it appears that the plaintiff, a railroad conductor, by virtue of his seniority rights under his contract of employment with the railroad company had become entitled, and had been assigned, to a certain daylight run. At the instance of the Order of Railroad Conductors, of which the plaintiff was a member, the railroad company promulgated a rule, or order, the effect of which was to transfer the plaintiff from the desirable daylight run to a night run. The plaintiff objected strenuously to the change, and subsequently brought suit against the railroad company and the other conductors involved for restoration of his assignment under his seniority rights. The Kentucky court of appeals held that the plaintiff's prior contract with the railroad company providing for seniority rights was valid and binding, and was beyond the power of the Order

of Railroad. Conductors to change or modify to the plaintiff's injury, without his consent. That case is not in point here, for the reason that there the union attempted to deprive the plaintiff of a contractual right previously established, while here the appellant had no such right, nor was he deprived of any.

The *Gulla* and *McNeill* cases, *supra,* simply held that a contract entered into between an employer and a labor union providing a certain scale of wages for employees could not be modified by an independent agreement between the employer and an individual employee who was a member of the union, resulting in a reduction of wages of the employee; and, further, that the employee not only could not waive the benefit of the contract between the employer and the union, but was entitled to recover from the employer the difference between the agreed scale of wage and the amount provided in the independent agreement with the employee. We have no such situation in the case before us.

Moreover, it is interesting to note that in the *Gulla* case, *supra,* the union itself was insisting that wages be paid the employee according to the agreement between the employer and the union. In the case at bar, the union itself negotiated, and now affirms, the oral contract according to which the appellant was regularly paid by the respondent. Furthermore, in the *McNeill* case, *supra,* the court used this language:

"The defendant [employer] cannot escape such liability [for wages stipulated in the contract with the union] by the plea of an alleged subsequent oral modification of the original agreement, *in the absence of proof that the union had consented to such attempted modification."* (Italics ours.)

We quote the foregoing language, not as indicating our view that a union may generally modify its contracts to the detriment of a union member, without his consent, but simply to show the apparent attitude of the New York court upon that question.

The *Christiansen* case, *supra,* cited by appellant, traces the development of the law relating to collective bargaining agreements, and adopts the modern view that such agreements give rise to valid, enforcible contractual obligations, and that they not only enter into individual contracts of employment, but also circumscribe the rights of the employer and the *members of the union* with respect to making individual contracts of employment. This is but another way of saying that a contract between an employer and a union cannot be modified with respect to a member of the union by an independent contract between the employer and the individual member providing for a reduced pay to the employee. The issue before the New Jersey court in the *Christiansen* case, however, was one between the employer and the *union,* wherein the union was insisting that the employer comply with the provisions of the collective bargaining agreement. Again, we may say, the instant case involves a different situation, as shown above.

In our opinion, none of the cases relied upon by the appellant is applicable to, or governing of the result in, the case at bar. Upon the facts as heretofore outlined, and upon the law as we interpret it, the judgment of the trial court is affirmed.

MILLARD, ROBINSON, JEFFERS, and GRADY, JJ., concur.

BEALS, J. (dissenting) — Respondent Claremont Apartment Hotel Company, in its answer, pleaded by way of affirmative defense that appellant, by his conduct, had estopped himself from claiming any amount as salary greater than that which he had received.

Appellant was a member of the union in question, and the union was entitled to represent him and its other members as their bargaining agency. In making contracts with employers, the union acts as the agent of the group of the employees of a particular employer who are members of the union. The right of employees to bargain collectively is firmly established.

It clearly appears from the record in the case at bar that it was orally agreed between an officer of the local union (acting with the approval of his superior) and respondent that the union scale agreed to between the hotel association and the union should not apply to appellant. There is no question but that the union represented appellant as his bargaining agency. One of the officers of the union testified that he informed appellant of the special agreement, by the terms of which appellant would receive a wage less than the union scale. On the other hand, appellant testified that, when he complained to the officers of his union that he was not receiving the union scale, he was assured that they would at some future time procure for him the additional amount, including back pay. Appellant denied that he had ever been informed that the officers of his union had made a special agreement with respondent concerning his wage, to the effect that he would receive one hundred dollars per month, instead of one hundred twenty-five dollars.

As to the authority of a labor union or its officers to modify a general agreement between the union and employers of its members to suit particular cases, the rule is stated in 31 Am. Jur., p. 874, § 102, as follows:

"It has been ruled that agreements between organizations of employees and their employers are not designed to place it within the power of the organization to change or modify the contract at pleasure, so as to affect injuriously the individual rights of its members theretofore secured by the agreement. This ruling is predicated upon the theory that the officers of labor unions are not to be deemed the agents of the members, so as to be able to affect their individual rights. Nor is the submission of questions involving such rights contemplated by the agreement of members of a union to comply with its rules and regulations and with the will of the lawfully constituted majority.

"Some courts have arrived at a contrary conclusion. There is, for example, a decision to the effect that the contract rights of individual employees are affected by modifications made in the contract between the employer and the union, for the reason that the union is the principal and not the agent. It has likewise been held that seniority

rights accruing to an individual employee under a collective bargaining agreement may be modified by a subsequent agreement which is in the general interest of all the members, although the individual member is harmfully affected thereby."

In an annotation found in 95 A. L. R. 54, appears the following:

"It is not within the power of a union, entering into an agreement with an employer, to change or modify the contract at pleasure so as injuriously to affect the individual rights of its members theretofore secured by the agreement."

In the case of *Piercy v. Louisville & N. R. Co.*, 198 Ky. 477, 248 S. W. 1042, the court of appeals of Kentucky held that a labor union which had represented its members in making a collective bargaining agreement had no authority to modify the general terms of the agreement so as to affect individual union members.

In my opinion, under the weight of authority, it should be held that the representatives of appellant's union had no authority (without appellant's concurrence) to bind appellant to work for a wage less than the union scale. Appellant denies that he ever consented to accept one hundred dollars in full of his wages, and testified that he frequently protested, both to respondent and to the officers of the union, against receiving a lesser wage than that called for by the scale.

In the case of *Huston v. Washington Wood & Coal Co.*, 4 Wn. (2d) 449, 103 P. (2d) 1095, we held that a member of a union could maintain an action against an employer, claiming the benefit of a contract between the union and his employer, even though the employee was not mentioned by name in that contract. In the case cited, the employee, after his employment had ceased, sued his former employer to recover a balance which he claimed due on account of wages earned. As in the case at bar, the subject matter of the action was the difference between the amount of wages paid and the union scale as agreed to between the union

and the employer. It appeared that the employee had, prior to joining the union, agreed with his employer to work for the wage which he received, and that the employee had never demanded that his employer pay him according to the higher union scale. It was held that, upon the facts shown, the employee was estopped from claiming the benefit of the union's contract, and a judgment dismissing the action, after a trial to the court, was affirmed.

In the case at bar, respondent pleaded that appellant was estopped from maintaining the action by his conduct, in that he, for a long period of time, without protest, accepted checks for his salary, each check showing the period of time covered thereby. Respondent also pleaded that appellant was estopped from maintaining this action by reason of the fact that he continued his employment without registering a protest as to the amount of the wages which he received.

In the *Huston* case, *supra,* it was apparently admitted that the employee had never demanded that his employer pay him the union wage. In the case at bar, appellant and his wife both testified that they frequently protested to respondent concerning the amount of appellant's salary. Respondent introduced evidence to the effect that no protests were made. Upon the record, a question of fact was presented concerning this phase of the case, which should have been submitted to the trier of the fact for determination.

In my opinion, the trial court erred in directing the jury to return a verdict in respondent's favor, and I am convinced that the judgment appealed from should be reversed and the cause remanded with instructions to grant appellant's motion for a new trial. A question was presented upon which the jury should have passed.

For the reasons assigned, I dissent from the conclusion reached by the majority.

SIMPSON, C. J., MALLERY, and BLAKE, JJ., concur with BEALS, J.