The complainant, a railroad clerk, seeks to compel his employer, the defendant Lehigh Valley Railroad Company, and his union, the defendant Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employes, to restore to him his seniority status, the retention of his position on the clerk's roster of the New York Division of the railroad as it was prior to September 22d 1937, recovery of earnings allegedly lost because of the deprivation of seniority rights, and an injunction restraining the defendants from violating a certain collective bargaining agreement. The suit is based upon written agreements made in 1923 and 1935 between the Lehigh Valley Railroad and clerks and *Page 77 
other office and station employes of the railroad represented by the Association of Lehigh Valley Railroad Clerks. (Exhibits C-1
and C-3.) The agreements contain rules and regulations governing the hours of service and working conditions of the clerical employes of the railroad then or thereafter to be employed by it, and provide for the recognition by the railroad of seniority rights of its employes as beginning "at the time the employe's pay starts." There is a clause therein that when any employes voluntarily left the railroad's service and subsequently re-entered it, they then would be considered new employes. The provisions governing seniority are (1923 agreement, ExhibitC-1):
Rule 3: "Seniority begins at the time the employe's pay starts * * *."
Rule 4: "Employees covered by these rules shall be in line for promotion. Promotion shall be based on seniority, fitness and ability; fitness and ability being equal, seniority shall prevail. * * *"
Rule 6: "Seniority rights of employes to vacancies or new positions will be governed by these rules."
Rule 16: "When reducing forces, fitness and ability being equal, seniority rights shall govern. When forces are increased, employes will be returned to service in the order of their seniority rights, fitness and ability being equal. * * *"
Rule 17: "A seniority roster of all employes in each seniority district compiled in accordance with the following standard form, will be posted in agreed upon places accessible to all employes affected. * * *"
Rule 21: "Employes whose positions are abolished may exercise their seniority rights, subject to Rule 4 over junior employes. * * *"
Rule 22: "Employes voluntarily leaving the service, will, if they re-enter, be considered new employes."
Rule 34: "Employes who have been in the service for one year or more may be given a leave of absence for ninety days and at the end of that time, or before, if desired, may resume their employment without losing their seniority. * * *"
In the latter part of January, 1932, the railroad contracted with the Universal Cartage Company (Universal Carloading 
Distributing Company, Inc.), whereby the cartage company was granted operating facilities on the railroad's Pier 8, North River Station, New York City. The cartage company, under the contract, took over work which had previously been done by the railroad. The railroad then reduced its clerical *Page 78 
force at that station. John Trainor, Hans Peterson and James Coffey, who had been employed by the railroad at the pier then entered the employ of the cartage company. The contract between the railroad company and the cartage company expired in 1936; thereupon these three men sought re-employment with the railroad through the Association of Lehigh Valley Railroad Clerks. The association asked for their reinstatement with a restoration of their seniority rights. It met with no favorable results; the requests were denied. The three men then consulted John J. Buckley, the chairman of the defendant brotherhood's system board of the Lehigh Valley Railroad. On February 25th, 1936, he communicated with the general manager of the defendant railroad requesting a hearing for the men. (Exhibit DA-1.) He received a reply on February 28th, 1936, in which the general manager stated that he could not entertain the request because the alleged grievances of these men were "being handled" by the Association of Lehigh Valley Railroad Clerks. He declared that the brotherhood did not represent the three men. (Exhibit DA-2.)
On April 19th, 1937, the brotherhood carried the matter to the National Mediation Board and requested it to have an election called to determine who was the bargaining agent for the clerical employes of the defendant railroads. (National Mediation Board Case No. R-338, Exhibit C-21.) The board heard the application in New York City on June 14th, 1937. It issued a "Findings to Determine Eligible List;" and its mediator, P.D. Harvey, "was directed to proceed to a determination by secret ballot or by check of authorizations, as to who may properly represent the groups of employes included within the Clerical, Office, Station and Storehouse employes of the Lehigh Valley Railroad as a single craft or class." Preparations for an election were being made by the mediator when, "under date of June 22d 1937, he was advised by the parties that they had disposed of the question, and under date of June 29th, 1937, a letter was addressed to the board by Mr. Geo. M. Harrison, Grand President, Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employes, advising that all differences in this *Page 79 
dispute had been composed by the parties to the dispute, and withdrawing the request of his organization from further investigation by the Board." On the basis of the letter referred to, the National Mediation Board then dismissed the proceedings.
On June 23d 1937, the railroad recognized and designated thedefendant brotherhood as the collective bargaining agent and representative of all clerical employes of the railroad in the place and stead of the Association of Lehigh Valley Railroad Clerks, despite the fact that no election had been held under the auspices of the National Mediation Board. Three days later Buckley wrote the general manager of the defendant railroad to reopen the matter for the purpose of determining the three men's seniority status. (Exhibit DA-3.) Subsequently, on September 21st, 1937, an agreement was reached whereby the three men obtained their former positions and the restoration of their seniority status as of the date of their original employment on the railroad. (Exhibit DA-5.) The act of the railroad in establishing the seniority status of the three men did not meet with the approval of the officers and members of the Lehigh Valley Black Diamond Lodge No. 847 of the brotherhood. On October 21st, 1937, that body, in conformity with the constitution of the brotherhood, applied to the grand president for leave to circulate a petition of protest against Buckley's action in behalf of the brotherhood to restore the original seniority of the three men. A petition to such effect was circulated and signed by 144 members of the brotherhood. The Grand Lodge failed to act on the petition; then the local lodges on the division appealed to the System Board of Adjustment. That board upheld Buckley. (Exhibit D-4.) An appeal was then taken to the grand president; he sustained the System Board. (Exhibit D-5.) The complainant also personally appealed to the grand president, who, after an investigation, upheld Buckley.
The action of the railroad and the brotherhood in restoring the men to their original seniority status is here challenged by the complainant who contends that it violates the terms of the agreement of 1923 (Exhibit C-1), superseded by the agreement of April 1st, 1935 (Exhibit C-3), which retains *Page 80 
the aforementioned rules governing seniority. He charges that Buckley's action was "illegal, abortive, arbitrary, and without the authority of the constitution and by-laws of the brotherhood. None of the local lodges or officers had ever approved entertaining the grievances of John Trainor, Hans Peterson and James Coffey respecting their seniority status on the railroad as required by the constitution and by-laws of the brotherhood."
The complainant originally entered the employ of the railroad as a clerk on December 10th, 1926. He resigned therefrom on October 5th, 1932. He was re-employed on April 15th, 1933 (Exhibit C-17.) The violation of the agreements aforesaid (Exhibits C-1 and C-3), it is contended, "caused the complainant to lose many days work, compelled him to work positions on irregular schedules and at lower rates of pay theretofore enjoyed by him, affected his opportunities for promotion and has otherwise caused him much irreparable injury and loss." (Exhibits C-18, C-19 and C-20.)
The power of equity to enforce the employe's right under a collective bargaining agreement is well established. This court has clearly defined its attitude in cases where a union interferes with the rights of an individual arising from an agreement with a third party. It, under certain circumstances, has gone to the extent of declaring that the individual, although a member of the union, is not required to exhaust the remedies provided by the union's constitution before he resorts to court for redress. Lo Bianco v. Cushing, 117 N.J. Eq. 593;177 Atl. Rep. 102; affirmed, 119 N.J. Eq. 377; 182 Atl. Rep. 874.
In Christiansen v. Local 680, Milk Drivers, c., 126 N.J. Eq. 508; 10 Atl. Rep. 2d 168, the court, in discussing collective bargaining agreements said:
"The contract between employer and union not only enters into the individual contract, but it circumscribes the rights of the employer and the members of the union with respect to making individual contracts of employment. It creates legal rights and duties which are independent of particular hirings. The development of the law on the subject is treated in95 A.L.R. 10. *Page 81 
"A collective bargaining agreement is the joint and several contract of the members of the union, made by the officers of the union as their agents. It is enforceable by or against individual members of the union in matters which affect them peculiarly; and it is enforceable by or against the union in matters which affect all the members alike, or large classes of members, for instance, those who are employes of the other party to the contract."
See Cameron v. International, c., Union No. 384, 118 N.J. Eq. 11; 176 Atl. Rep. 692; Collins v. International, c.,United States and Canada, 119 N.J. Eq. 230; 182 Atl. Rep. 37;International Ticket Co. v. Wendrich, 122 N.J. Eq. 222;193 Atl. Rep. 808. For other authorities see 1 Labatt's, Master Servant (2d ed.) § 2665; Dorrington v. Manning,4 Atl. Rep. 2d 886; Bogni v. Perotti, 224 Mass. 152;112 N.E. Rep. 853. These same authorities and the cases cited therein support the principle that our courts of law and equity will protect any breach or interference of an individual's rights arising from a contract of employment.
Equally important to the right of collective bargaining on the part of the unions is the right of seniority for employes. There have been many articles written lauding, approving and sustaining seniority rights, but I find none on the subject that is more clearly expressive of such rights than that of Marshall A. Pipin in his article in 6 Univ. of Chicago, L.R. 651, 657, wherein he, in part, says:
"Seniority represents in the highest degree the right to work. By seniority the oldest man in point of service (ability and fitness for the job being sufficient) is given the choice of jobs, is the first promoted within the range of jobs subject to seniority, and is the last laid off. It proceeds so on down the line to the youngest in point of service. Seniority is more than merely the right to work; it is the best kind of unemployment insurance. It assures the man that the longer he works the more certain it is that he will retain his job at a wage greater than the small amount available as unemployment compensation. Seniority is no less a property right and entitled to equitable protection because it is subject to modification by changing the craft agreement by which it was created or because the employe is subject to discharge and is not required by the craft agreement to continue to work for the employer.
"* * * In many respects seniority is a greater protection to the employe than a license is to the professional man. The latter prevents *Page 82 
competition only from those not admitted to the profession. The former protects the employe not only against the man not within the seniority district but also from the younger men in the same district."
In 12 Jour. of Business, Univ. Chicago, 153, 173, SeniorityRights Before the Courts, Dan H. Mater, the author, said:
"Because of the heavy investment in his seniority district which the employe makes by accepting subaverage wages for the first several years in the promise of greater security and higher-than-average income in later years, few contracts can be more important to an individual than one involving seniority.
"* * * Perhaps it is impossible for either a political or an industrial democracy to function so that no individuals suffer, but the peculiar nature of seniority makes any injury thereof doubly severe upon the individual."
"It is clear that the value of the preferential rights of the older men is greatly reduced by the rule of distribution. Not only their current wages, but also their pension rights are affected, since pensions are determined both by years of service and average earnings." 47 Yale L.J. 79 note 43.
"The various railroad labor boards have insisted that every reasonable interpretation in favor of seniority should be adopted, since seniority is considered as one of the foundations of the railroad trade agreement." 47 Yale L.J. 78.
Seniority is a property right. It is in a sense a reward for length of service combined with capacity of performance. An interesting exemplification of the seniority rule is expressed inGrand Int. Brotherhood of Locomotive Engineers v. Mills,43 Ariz. 379; 31 Pac. Rep. 2d 971, 979, where the court, among other things, said:
"A study of the reasons for, and the history of, the seniority rule which, although best known among railroad men, is growing more and more in favor among the workers in every class, makes this clear. So long as the contract of employment between a corporation and its hundreds and thousands of employes provides for seniority, it is in effect unemployment insurance which the worker has purchased by his years of faithful service. Essentially it is as much a part of his wages as though he received an increase therein and used the increase to buy such insurance therewith. Ten years of service gives him a far greater certainty of retaining his employment than *Page 83 
is obtained by one year of service, and in times of fluctuating employment particularly this is of great money value. The very fact that, as the record revealed, the matter was fought so bitterly within the ranks of the brotherhoods themselves, shows that it is not a mere imaginary or sentimental interest which plaintiffs are seeking to protect, but something which may mean the difference between poverty and a competence, between public aid and a self-respecting and independent home."
And in Gleason v. Thomas (W. Va., 1939), 5 S.E. Rep.
2d 791, the court observed:
"Seniority rights result from the desire of railway labor organizations to protect men of extended service in the right to their jobs, and to select their jobs, in preference to men who have had shorter periods of service. For example, when a man is employed by the Railway Company as a fireman, the date of his employment is noted, and on that notation his seniority rights are based. He takes employment subject to the right of an older employe to be preferred not only in his choice of a job, but his right to promotion as well; conversely, he is entitled to such preference over those whose employment is subject to his own."
In McCoy v. St. Joseph Belt. Railway Co., 229 Mo. A. 506;77 S.W. Rep. 2d 175, it is stated:
"This right of seniority not only entitled an employe to promotion in case, for any reason, the place held by the man ahead of him became vacant or he did not fill the same, but it also entitled the employe holding such seniority number to be called to employment in preference to any one holding a lower number. In times when on account of a slack in work a man was not needed and was `laid off' temporarily, the place he occupied by reason of his seniority was still a valuable right, since it governed his right to be recalled to work or preference therefore and also, perhaps, his rate of pay, if entitled to a promotion to a place of greater or higher rank than before. The contract guaranteed the employe the right to work according to his seniority in service and also provided that he would not be discharged without cause, or without a hearing." *Page 84 
Pertinent cases wherein the courts have taken jurisdiction to protect an infringement of an employe's seniority right arising under a collective bargaining agreement are: Robinson v. Dahm
(1916), 159 N.Y.S. 1053; Hamilton v. Rouse (1917),165 N YS. 173; Core v. Pennsylvania Railroad Co., 259 N.Y.S. 410;affirmed, 260 N.Y.S. 941; Lockwood v. Chitwood, 185 Okla. 44;89 Pac. Rep. (2d ed.) 951; Gregg v. Starks (1920);189 Ky. 834; 224 S.W. Rep. 459; Capra v. Local Lodge No. 273
(1938), 102 Colo. 63; 76 Pac. Rep. 2d 738; Rentschler
v. Missouri Pacific Railroad Co., 126 Neb. 943;253 N.W. Rep. 694; Ledford v. Chicago, M. St. P. P.R. Co., 298 Ill. App. 298; 18 N.E. Rep. 2d 568.
The right of the brotherhood unofficially (and not as bargaining agent) to intercede for the three men aforesaid to be re-employed by the railroad is conceded; but it is quite another thing for it to usurp powers not delegated to it, clothe itself in the garb of a collective bargaining agent and to completely disregard the existence of rule 3 of the agreement which says, "Seniority begins at the time the employe's pay starts," and contend that the railroad should re-establish their seniority status over the rights of many other employes, including the complainant (who was and had been in the railroad's service before and at the time of the re-establishment of the three men in the railroad's service). Its position finds no support under the provisions of rule 22 of the same agreement; which rule considers these three men new employes. The brotherhood's attitude is wholly unwarranted and plainly discriminatory. It was never designated or elected as the bargaining agent. These three men voluntarily left the railroad's service and obtained employment with the cartage company. (See rule 22.) They eliminated themselves entirely from the railroad's employ. The rules of service and of seniority as set forth in the agreement aforesaid are clear, definite, and expressed in plain English. They fix the status of the employes of the railroad with precision and certainty. To give approval to the defendants' argument would, in effect, be endorsing the repudiation of a solemn declaration of property rights. The complainant's contention that his rights were established by the agreement between the *Page 85 
railroad and the association is correct. They were in existence when the three men were re-employed. The railroad, it will be observed, prior to the appeal to the Mediation Board, denied the appeals of these three men for reinstatement of their seniority rights and questioned the right of the brotherhood to act since the association had previously presented the claims of the men and was acting for them.
The pending proceeding is not a controversy as comprehended by article 5, section 2 of the constitution of the brotherhood (Exhibit D-1), which provides that a member may not resort to any court in any case in controversy arising within the organization or under its law until he has exhausted all of the remedies provided therein. Lo Bianco v. Cushing, supra. The instant case involves the right of the complainant to institute suit against the defendant brotherhood which has interfered with his contractual right of employment. Alfred W. Booth Brother
v. Burgess, 72 N.J. Eq. 181; 65 Atl. Rep. 226; Brennan v.United Hatters, c., 73 N.J. Law 729; 65 Atl. Rep. 165;Blanchard v. Newark Joint District Council, c.,77 N.J. Law 389; 71 Atl. Rep. 1131; affirmed, 78 N.J. Law 737;76 Atl. Rep. 1087; Malone v. B. of L.F. E., 94 N.J. Law 347;110 Atl. Rep. 696; Kinane v. Fay, 111 N.J. Law 553; 168 Atl. Rep. 724. InMalone v. B. of L.F. E., supra, although differing in some particulars from those of the instant case, nevertheless involved the same essential principles. It was there stated:
"We are unable to see that the existence of this right in the plaintiff is to bar him from asserting what we deem to be clear common law right of action for damages. We are not told by counsel what is to become of the plaintiff's wages that he may have lost in the meantime nor are we advised why the defendants are to be exempt from suit while plaintiff strives for reinstatement. If they are exempt now, it would seem that they would be exempt in resisting the plaintiff's reinstatement at every step. Such a proposition shocks the most elementary sense of justice."
In Piercy v. Louisville and N. Railway Co., 198 Ky. 477;248 S.W. Rep. 1042, where the facts were identical with the instant case, the court held: *Page 86 
"But here we have a personal right acquired by him as against the railroad company under contract, and we have the Order of Railroad Conductors asserting the right to waive for him the benefits of that contract. It could not have been in contemplation by a member of such organization that he agreed when he entered to submit to the order for decision a controversy involving his rights as against a third party."
Our Court of Errors and Appeals has held that the duty to exhaust the remedies provided by the union's constitution is limited to controversies between the union and its members interse. Cameron v. International Alliance, c., supra; Collins v.International, c., United States and Canada, supra.
In O'Keefe v. Local 463 of United Association of Plumbers,c., 277 N.Y. 300; 14 N.E. Rep. 2d 77, a similar defense was raised by the union, and the court held:
"The plaintiffs have violated no provision of the constitution or by-laws by appeal to the courts. The provisions relied upon by the defendant union in that respect have no application here. Indeed, by seeking an authoritative determination of the rights and powers of the union they have probably rendered a service to the union."
Exhibit C-21 covering the order of the Mediation Board is evidence that the board never certified the brotherhood as bargaining agent for the clerical employes of the defendant railroad. Under the circumstances it was without authority to intercede or act in any manner to restore seniority rights to Coffey, Trainor and Peterson.
The pertinent provisions of the Railroad Labor Act,45 U.S.C.A. 151 § 162, are:
"Third. * * * Representatives for the purposes of this Chapter shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; * * *.
"Fourth. * * * Employes shall have the right to organize and bargain collectively through representatives of their own choosing. * * *
"Ninth. * * * If any dispute shall arise among a carrier's employes as to who are the representatives of such employes designated and authorized in accordance with the requirements of this Chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify *Page 87 
to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employes involved in the dispute and certify the same to the carrier. * * *"
By reason of this law a carrier or railroad cannot substitute and recognize a new bargaining agent where the class is presently represented by a bargaining agent on the purported proof that the "new bargaining agent" represents the majority of the employes of the class without an election under the supervision of the National Mediation Board. Texas and N.O.R. Co. v. Railway andS.S. Clerks, 281 U.S. 548; 50 S.Ct. 427; Labor Board v.Bradford Dyeing Association, 310 U.S. 318; 60 S.Ct. 918;National Labor Relations Board v. Whittier Mills Co.,111 Fed. Rep. 2d 474. Because it is a fundamental presumption that the established status of a bargaining agent continues until the contrary is shown. National Labor Relations Board v. WhittierMills Co., supra; National Labor Relations Board v. HighlandPark Manufacturing Co., 110 Fed. Rep. 2d 632; Tischler v.Steinholtz, 99 N.J. Law 149; 122 Atl. Rep. 880; Mimnagh v.Falato, 110 N.J. Law 266; 164 Atl. Rep. 393.
The recognition of the defendant brotherhood as bargaining agent by the railroad was obviously unjustified, an arbitrary assumption of authority and a direct violation of the statute aforesaid. In Texas and N.O.R. Co. v. Railway and S.S. Clerks,supra, this defendant brotherhood took a position opposite to its present one. It there argued that the railroad's recognition of an independent union while it was the bargaining agent was in violation of the Railroad Act, because the employes affected had not been permitted the right to vote for a change of bargaining agent. The Supreme Court sustained its contention and held:
"* * * Such collective action would be a mockery if representation were made futile by interferences with freedom of choice. * * * The statute is not aimed at this right of the employers but at the interference with the right of employes to have representatives of their own choosing. * * *" *Page 88 
The Supreme Court reasserted the same principles in sustaining the application of the Railroad Labor Act as amended in 1934 inVirginian Railway Co. v. System Federation No. 40,300 U.S. 515; 57 S.Ct. 592.
In the course of the hearing in the instant case, it was claimed that Buckley had been chairman of the System Board of the brotherhood on the defendant railroad. He, however, admitted that he had never been elected by the clerical employes of the railroad after June 23d 1937, when the railroad recognized the brotherhood as their bargaining agent. Lodges 845 and 847 of the brotherhood had no voice in this election. Complainant objected to his qualifications as such chairman. (Exhibit D-1, page 94, section 7 (a), page 95, section 8 (c).) Decision was reserved on the objection. I feel the objection was proper; it is sustained.
The complainant is entitled to the relief prayed for in the bill. *Page 89