The complainants seek to be reinstated in positions which they formerly held with the defendant company. They were dismissed October 11th, 1947, from which time they claim compensation for wages lost. The dismissal from the defendant's service allegedly resulted from their refusal to obey instructions of Mr. G.B. Hastings, the defendant's assistant baggage foreman.
The complainants say that the dismissal was a violation of their seniority rights and other rights to which they were entitled under the provisions of a collective bargaining contract entered into between the defendant carrier and The Clerical, c., Employees, represented by the Brotherhood of Railway and Steamship Clerks, Freight, Handlers, Express and Station Employees. While the complainants were not *Page 307 
members of that Brotherhood they concededly became entitled to the benefits, and subject to the limitations, of the agreement between the Railroad and the Brotherhood, effective December 1st, 1943, amended July 1st, 1945 — in accordance with the provisions of the Railway Labor Act (U.S.C.A. title 45 §§ 151 et seq.). The Brotherhood was the collective bargaining representative for all employees doing the same type of work in which the complainants were engaged.
The provisions of the agreement between the defendant Railroad and the Brotherhood (Exhibit C-1) which concerns the issues herein involved, read as follows:
"ARTICLE IV — DISCIPLINE AND GRIEVANCES
"Rule 41 — Investigation, Appeal and Decisions
"(a) (Amended 7-1-45) Employes covered by these rules, whose applications are approved, shall not be disciplined by record, suspended (except pending investigation) or dismissed without proper investigation. Investigation shall be held as promptly as circumstances will permit, the employes being notified in writing, in advance, of the charge and time of investigation.
"Employes may have witnesses of their own choice (except discharged employes) present and shall have the right to be represented by the duly accredited representative, as that term is defined in this agreement. Copy of employes' statements, when taken in writing, will be furnished to them on their verifying and signing same.
"(b) Evidence pertaining to the case will be made available by the Management to the representative of the employes and all decisions will be promptly rendered, within thirty (30) days, if possible.
"(c) If the decision is in favor of the employe, the record will so indicate, and if suspended or dismissed, employe will be reinstated with all rights unimpaired and if found blameless, compensated for wage loss and actual expenses incurred.
"(d) If an employe is suspended, the suspension shall date from the time he was taken out of the service.
"(e) An employe, on request will be furnished a letter stating the cause of discipline.
"(f) The right of appeal by the employe or his representative in the regular order up to and including the highest official designated by the Railroad to whom such appeals may be made is hereby conceded. When appeal is taken it will be made as soon as possible after decision is given and a copy of the appeal furnished to the official whose decision is appealed. Decisions on appeals will be given within a reasonable time.
"(g) (Amended 7-1-45) An employe who considers himself otherwise unjustly treated, and sets forth such complaint in writing, will have the same right of investigation and appeal as provided above. *Page 308 
"(h) Prior to the assertion of grievances as herein provided, and while questions of grievances are pending, there will neither be a shutdown by the employer nor a suspension of work by the employes."
On October 11th, 1947, at or about 10 P.M., the complainants and one Wallace Whaley, Jr., were directed by Hastings, their superior, to load mail bags into a car of the defendant company, which was to depart from its Jersey City terminal at or about 12:30 A.M. The car stood on track 9 in the station. The mail bags stood on a platform approximately 200 feet east of where the car stood. The bags of mail were transported from the platform to the car on a four-wheel truck having a flat carrying surface of about four feet above the ground, and which was about ten feet in length and four feet wide. The complainants and Whaley loaded four trucks of bags of mail and drew them from the mail platform to a point near the car on track 9. The car in which they were to deposit the mail bags was a refrigerator car and not a regular mail car. The platform of the truck containing the mail bags was about two feet below the floor of the refrigerator car and the truck stood approximately one and one-half feet from the car. The average weight of each bag of mail was about 75 pounds. The complainants contend that they were never before called upon to place mail in a refrigerator car and in the situation which then prevailed, felt it would be dangerous for them to undertake to do so. The complainant Coyle left Cappozzoli and Whaley and proceeded to the office of the assistant baggage foreman Hastings to acquaint him with the existing situation, and there told him:
"* * * we had a different car up there and I believed it was the wrong car, because it was a refrigerator car, and that it was very dangerous if we had to work there, and we needed a plank according to Rule 402. And so he then went to the telephone and he called somebody. He asked him if he could have the car changed. He went to the telephone and I heard him asking somebody if he could have a car because the wrong car was placed there, and he asked to have another car placed there. So he then hung up and he told me he couldn't have the car changed because it was too *Page 309 
much trouble. And he told me, `I will try and find you a plank.' He went outside and looked around for a while for about eight or ten minutes, and he came to me and said to me, `I cannot find a plank — let us go up to the car.'" (Transcript, page 11.)
Hastings accompanied Coyle to the refrigerator car, and —
"Mr. Hastings looked at it and he said to us, `Can't two fellows stand inside of the car and one fellow hand the bags to them?' He said, `Couldn't you do it that way?'"
"Q. You three told him what? A. We told Mr. Hastings if we did it that way we would be violating the rules of the railroad and took a chance of getting hurt, and there was quite a space there and if we did it without a plank, and lots of time they couple up cars, and if we lost our balance and fell between the space, we could easily fall on the track and be killed." (Transcript, pages 11, 12.)
The defendant carrier's book of "Safety Rules" (Exhibit C-2) provides:
"402. Gang plank must be placed and properly secured immediately upon opening car doors."
"445. Watch to avoid sprains or strain when handling freight, baggage, mail, and express as result of losing hold or balance."
"471. Watch to avoid slipping, tripping, falling or turning ankle."
The complainant employees told Hastings that if they violated Rule 402 and were injured then they would not be able to collect compensation. They allege that he replied, "`Well, we can't get the car changed. * * * I have no plank. * * * Either you do it that way or go home.'" (Transcript, page 12.)
The three employees thereupon went to the baggage room and changed their clothes and left the job. They told Hastings they would return the following night. Whereupon Hastings said, "`Don't come back here until you see Mr. Dooley [the station master]. See Mr. Dooley before you come back.'" (Transcript, page 13.)
On October 15th, 1947, the complainants called at Dooley's office at the Erie Depot in Jersey City, saw Dooley who said, "`Well, fellows, being that you are here to-day,' he said, `we *Page 310 
can go up and have it done now.'" Thereby indicating that they were to have an investigation in accordance with a written notice to them which in part reads:
"* * * you are hereby notified to appear at my office at 2:30 P.M. Thursday, Oct. 16th, 1947 for investigation in connection with your refusal to carry out instructions of Mr. G.B. Hastings who is your superior on Saturday October 11th * * *.
T.J. SANOK, P.T.M."
The complainants state that their reply to Dooley was — "What is the rush?" and that Dooley said, "`It is just a matter of formality.'" (Transcript, pages 15, 16.) Whereupon they proceeded to Sanok's office in the railroad terminal where they remained from 5 P.M. until approximately 8 P.M., under examination by defendant's representatives, of the incident of October 11th aforesaid. Dooley, the defendant's station master, was present during the proceedings. Hastings, the assistant baggage foreman, was not present. His statement of the incident was read to the complainants over their objections. The complainants asked Sanok: "`Why couldn't Mr. Hastings be here?'" and Sanok replied: "`Well, it is just a matter of routine.'" * * * "`It isn't necessary for him to be here.'" (Transcript, page 17.) Hastings' statement,Exhibit D-14, was dated October 11th, 1947.
It appears that Whaley, who was involved in the incident of October 11th, was not present at the Sanok meeting. He received a notice to appear for a hearing on October 16th, 1947. (ExhibitD-21.) He allegedly made a written statement (Exhibit D-20) dated October 14th, 1947, which the defendant's representative read at the hearing before Sanok. The complainants asked why Whaley was not present and they allege that Sanok replied that Whaley had already given his statement and it wasn't necessary for him to appear. The complainants told Sanok the reason why they went home was: "The car was not the right car for the mail, and the floor of the car was two feet higher than the platform, and there was a distance between the car and the platform of a foot and a half, and we wanted to have a plank or have the car changed, and Mr. Hastings said it wasn't possible, and *Page 311 
he gave us the choice we could do it that way or go home." (Transcript, page 18.)
The complainants in December, 1947, received a record of discipline from the defendant dated November 20th, 1947, as follows:
"Dismissed from service for refusing to perform work as instructed by Asst. Baggage Agent, Oct. 19, 1947." (Exhibit C-4,Exhibit C-6.)
Upon receipt of this notice, or shortly thereafter, the complainant Coyle spoke to the station master Dooley about writing the defendant's home office in Cleveland, Ohio, to get his job back. Dooley replied: "`It wouldn't do any good.'" (Transcript, page 20.) Coyle says that two days after conversing with Dooley he went to the office of the defendant's superintendent, Mr. G.C. White, which is located at the defendant's terminal in Jersey City. He there showed his letter of discipline to the man in charge of White's outer office who took it and apparently went to White's office. He returned therefrom and said to Coyle: "`Mr. White was busy and he couldn't see me.'" (Transcript, page 24.) Coyle said three days later he again visited White's office "and the same thing happened." (Transcript, page 24.)
Both complainants say that again on December 15th, 1947, they went to White's office and asked to see him and were told that White was busy, and the letter speaks for itself.
The complainants state that they have endeavored to obtain employment from the time that they were dismissed from the defendant's service but have met with no success. They contend they have lost earnings from that time until the date of the hearing of this issue. They testified their average weekly pay was $65.
The passenger train master, Thomas J. Sanok, who conducted the investigation of October 15th, 1947, under the supervision of the yardmaster Dooley, testified:
"Q. Now, you knew that when you read the statement of Mr. Hastings, they [employees herein] told you that statement was wrong, did they not, as to their refusal to work? A. Yes, that's right. *Page 312 
 "Q. And didn't you think it was necessary in view of their statement that the statement which he made was wrong, that he should have been produced before you? A. No."
Station master Thomas F. Dooley declared that he selected trainmaster Sanok to conduct a hearing for the men. He stated that Hasting's statement of October 11th, 1947 (Exhibit D-14) was read to the complainants and that the statement of Whaley taken on October 14th, 1947 (Exhibit D-20) was likewise read to the complainants. He further said that he recommended the dismissal of the complainants, and that Whaley be suspended for five days; the suspension, however, was increased to ten days by Superintendent White. Whaley's offense was allegedly the same as the complainants. The discipline imposed by the defendant against the complainants in the circumstances shows harshness and unjustified discrimination.
Complainants contend that they were denied a proper investigation or hearing by the defendant; that under the collective bargaining contract they should have been given fair hearing and be confronted by their accusers, with the constitutional right to examine them as to the truth or falsity of the charges preferred against them. They were denied that right. The complainants at the so-called investigation or hearing very properly objected to the admission in evidence of the two written statements against them of the two absent witnesses. They direct attention to Article IV — Discipline and Grievances, Rule 41 — Investigation, Appeal and Decisions, hereinabove set forth.
These provisions most clearly indicate that an employee cannot be dismissed unless a charge is first made against him and a hearing is held at which the employee shall be confronted with the witnesses who are called to give evidence against him. SeeBrotherhood of Railroad Trainmen v. Hill Bus Co., 137 N.J. Eq. 408; 44 Atl. Rep. 2d 904; affirmed, 139 N.J. Eq. 304;51 Atl. Rep. 2d 116.
The notice served upon the complainants under Rule of the collective bargaining agreement governing hours of service and working conditions made between the defendant and The Clerical,c., Employees, represented by the Brotherhood *Page 313 
of Railway and Steamship Clerks, c., effective December 1st, 1943, amended July 1st, 1945 (Exhibit C-1) notified them to appear on Thursday, October 16th, 1947, for investigation. The hearing, however, was conducted on October 15th, 1947, instead of October 16th, 1947, as stated in the written notice (ExhibitC-3, Exhibit C-5). Such shifting of the date was clearly irregular.
It is contended by the defendant that the complainants' application for relief should have been instituted by them in the first instance in another tribunal. That contention is without force. An employee's action against a railroad growing out of grievances or out of the interpretation of agreements, may be brought either in a court or may be settled by the administrative remedies prescribed. U.S.C.A. title 45 § 153. See Watson v.Missouri-Kansas-Texas Railroad Co., 173 S.W. Rep. 2d 357.
It appears in Moore v. Illinois Central Railroad Co.,312 U.S. 630; 61 S.Ct. 754, that an employee's administrative and judicial remedies are concurrent.
It has been held that the essential elements of a fair trial are notice, an opportunity to be heard, an opportunity to defend, and that the proceeding adopted should be orderly. Not all of those necessary elements were present at the alleged hearing.
"A fair trial is a legal trial, one conducted according to rules of common law except in so far as it has been changed by statute, one where accused's legal rights are safeguarded and respected." Johnson v. City of Wildwood, 116 N.J. Law 462;184 Atl. Rep. 616.
"The essential elements of due process of law are notice, an opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case." DiMaio v. Reid,132 N.J. Law 17; 37 Atl. Rep. 2d 829.
"A `fair trial' is one where the legal rights of the accused are safeguarded and respected." Levinson v. Mooney,128 N.J. Law 569; 27 Atl. Rep. 2d 9. See, also, Kruttschnitt v.Hagaman, 128 N.J. Law 246; 25 Atl. Rep. 2d 200.
In Lehigh Valley Railroad Co. v. Snyder, 56 N.J. Law 326;28 Atl. Rep. 376, it was stated: "The employee has the *Page 314 
right to have the question of fact determined by a competent tribunal, and not by the mere arbitrary act of his employer interested in its determination."
In Dooley v. Lehigh Valley Railroad Company of Pennsylvania,130 N.J. Eq. 75; 21 Atl. Rep. 2d 334, it was held: "The power of equity to enforce the employees' right under a collective bargaining agreement is well established. * * * [The employee] is not required to exhaust the remedies provided by the union's constitution before he resorts to court for redress."
Safety Rule 402 made and promulgated by the defendant required the complainants to do certain things under certain circumstances. They were not required to place themselves in a position the consequences of which were likely to cause them physical harm. I feel that their attitude as indicated by the evidence warranted them in refusing to follow the orders or directions of the defendant's assistant baggage master Hastings.
The defendant's argument that this court has no jurisdiction to hear de novo the merits of the defendant's charges, is without foundation. Fagliarone v. Consolidated Film Industries, Inc.,20 N.J. Mis. R. 193; 26 Atl. Rep. 2d 425; affirmed,131 N.J. Law 315; 36 Atl. Rep. 2d 297.
The defendant takes the position that as a prerequisite to bringing this suit, the complainants were required to appeal to the highest official designated by the railroad to whom such appeals may be made. The complainants testified that they did appeal to Superintendent White but were ignored.
See Earle v. Illinois Central Railroad Co., 167 S.W. Rep.
(at p. 24).
I shall advise a decree that the complainants be reinstated to their former positions with the defendant, with their seniority rights unimpaired, and that they are entitled to back pay from the time of their dismissal to the time of their reinstatement. *Page 315