JOHN A. MCCOY, RESPONDENT, v. ST. JOSEPH BELT RAILWAY CO., APPELLANT.—77 S. W. (2d) 175.

Kansas City Court of Appeals. November 13, 1934.

*Randolph & Randolph* and *Nile Vermillion* for respondent.

*Brown, Douglas & Brown* for appellant.

TRIMBLE, J.—Plaintiff, formerly employed as a switchman in the yards of defendant at St. Joseph, Missouri, brought this suit on April 14, 1933, to recover damages for an alleged violation of a writ-

ten contract executed on March 10, 1928, in regard to his "seniority rights" in such employment, which governed his right to continue in such employment, and to be recalled thereto according to such seniority whenever and after he has been temporarily "laid off" on account of a slackening or less amount of business to be done in said yards.

After a trial, the jury returned a verdict of $3000 in plaintiff's favor, and judgment being rendered thereon, defendant appealed.

The contract sued on was executed March 10, 1928, as heretofore stated, by the president of the defendant, for said railroad on the one hand, and, for the yardmen, by a committee of three known as the "Grievance Committee" of the yardmen, that is, those who did the switching in the defendant's yards. These switchmen, called yardmen, constituted local lodge No. 92 of the Brotherhood of Railroad Trainmen (hereinafter for brevity called the B. R. T.). And the members of said local lodge No. 92 elected this "Grievance Committee" of the personnel required by the Constitution, and in accordance with, General Rule 1 of the Constitution and By-laws of the B. R. T. This committee dealt with the railway company concerning the following matters: What should constitute a day's work, the rate of pay therefor, the men's rights of seniority, their right to preference in work and promotion and the general working conditions in the yards.

Plaintiff entered defendant's employ as a switchman or yardman in 1918, and continued therein until sometime in April, 1932, when his employment ceased as hereinafter set forth. So that, at the time the contract herein sued on was executed, to-wit, March 10, 1928, plaintiff was in defendant's employ as a yardman as aforesaid and was a member of local lodge No. 92 of the B. R. T. The defendant railway company had been dealing in this manner with its yardmen, through such a committee, since plaintiff entered its employ in 1918.

The said contract entered into by the railway company and the above mentioned committee, contained, among many other things, the following provisions in paragraphs (a), (b), (g) and (m) of Article 12, to-wit:

"(a) Seniority rights of yardmen shall date from the day they first perform service in the yard as yardmen."

"(b) The right to preference of work and promotion will be governed by seniority in the service, the yardman oldest in the service will be given preference if competent, but if considered not competent, he will be advised in writing if a letter is requested."

. . .

"(g) Yardmen will not be suspended or dismissed from service without cause. Yardmen suspended or dismissed will be given a hearing within five days, if application for a hearing is made in writing to the superintendent or general manager. At the hearing the yard-

men can be represented by any person of his choice. If suspension or dismissal is found unjust, he will be reinstated and paid for all time lost."

. . .

"(m) This agreement supersedes all previous agreements and shall be in effect until March 10, 1929, and thereafter, subject to thirty days' notice by either party to the other of a desire to change or terminate the same or any part thereof."

Plaintiff alleged, and the evidence in his behalf clearly tended to show, that from and after the execution of said contract he worked thereunder and faithfully performed all his duties and services; was a competent and skillful employee of defendant and gained "a valuable seniority right thereunder" and that he was No. 17 on the "seniority list," and was never reprimanded nor complained against on account of the character of his work. This right of seniority not only entitled an employee to promotion in case, for any reason, the place held by the man ahead of him became vacant or he did not fill the same, but it also entitled the employee holding such seniority number to be called to employment in preference to anyone holding a lower number. In times when on account of a slack in work a man was not needed and was "laid off" temporarily, the place he occupied by reason of his seniority was still a valuable right since it governed his right to be recalled to work or preference therefor and also, perhaps, his rate of pay, if entitled to a promotion to a place of greater or higher rank than before. The contract guaranteed the employee the right to work according to his seniority in service and also provided that he *would not be discharged without cause, or without a hearing.* If dismissed or suspended, he was entitled to a hearing within five days, and, if upon a hearing, his dismissal or suspension was found to be unjust, he was to be reinstated and receive pay for all time so lost.

After said contract of March 10, 1928, was signed by the president of the railway company and the aforesaid committee, a copy thereof was sent to each yardman, including plaintiff, and from that time up to August 1, 1930, it was the contract under which the men worked, recognized as such by both the company and the men.

On August 1, 1930, a notice was posted by defendant in the yards that the management of the defendant company would be changed so that the Union Terminal Company (a switching company in St. Joseph), or the officials thereof, would take over the management of the yards of the defendant railway. The result was that defendant's employees became concerned or anxious about their status, or, as one of the witnesses put it, the employees were "wondering where we would wind up or what we were going to have left."

Thereupon, Clark (the chairman of the committee representing the

groups of men working for the defendant railway), and Farmer, chairman of the committee for the men employed by the Union Terminal Railway, sent a request to the Grand Lodge of the B. R. T. to come and advise them. (Farmer, that night, cancelled his request, but Clark's remained.) In response to such request for assistance, McQuaid, vice-president of the B. R. T. came. Up to this point there is no conflict in the testimony, but from there on, it conflicts. However, there is ample testimony fully tending to show: That McQuaid was sent for to come and *assist* the men in their protest to the railway about the agreement to be made concerning their seniority rights and other conditions under which they were to work, not to *decide* for them the contract they should make or accept.

The evidence in plaintiff's favor is further to the effect that without any authority from the men, he sought to change the seniority rights and positions of the employees of defendant, over their objections, including plaintiff. He prepared a seniority list of the consolidated employees, that is, of both defendant Belt Railway and of the Union Terminal Railway, in which consolidated list the seniority of defendant's employees was reduced, and plaintiff's seniority was lowered from that indicated by his number 17 to that indicated by the number 31, over the protests, not only of the men themselves, but of the grievance committee which had been elected as successors to the members of the committee which had negotiated the contract of March 10, 1928; that McQuaid told the men that they would have to take the new arrangement whether they liked it or not; that, in the face of the protests of the men, he turned the list he had made *himself* over to the defendant's manager and drew up a letter to Mr. Van Vliet of the Union Terminal Railway Company to the effect that the seniority list had been agreed upon by the respective committees and the employees on both properties (i. e., the yards of both companies) "in so far as switching operations are concerned" and that "the employees of the St. Joseph Belt Railway have elected to work under the schedule in effect between the Union Terminal Railway Company and the Brotherhood of Railroad Trainmen."

The evidence in plaintiff's favor further tends to show that *defendant's manager* told McQuaid to put out the above mentioned letter reciting that an agreement had been made. No denial of this was put in evidence though the officer in question was present in court.

The evidence in plaintiff's favor is further to the effect that it was never agreed by the committee either to consolidate the lists or to change any working arrangements, nor was any vote taken on these matters, and the matters stated as agreed to in the letter above mentioned were not agreed to at all. In fact, no notice was given to the men's committee or to plaintiff, of the change, other than the posting of the notice in the yards as aforesaid.

On cross-examination of Farmer, a witness for defendant, it was brought out that in the Constitution of the B. R. T. it was provided that "when through lease, purchase or *otherwise*" a line of railway is taken over, all yardmen on the *line taken over* shall be conceded the right to go with the line or portion thereof taken over, by which they had been previously employed "and shall be regarded as having prior rights in their respective classes to work on runs originating and terminating on the territory with which they are transferred." (The yardmen, including plaintiff, being engaged in the work of switching trains within the yards of the defendant, came within that category.) The witness admitted that in effecting the consolidation between the two railroads, they did not follow that rule or provision of the constitution as to "prior rights."

It was also shown in evidence that under seniority rights as existed under the *original* seniority list, owing to the withdrawal of several men ahead of him in seniority, either because of death or of quitting work by resignation, plaintiff could have had *regular* work by January 1, 1931; that before the consolidation of work, and of the men, was attempted to be made, plaintiff worked an average of one-half time at $6.60 per day up until February, 1932, and thereafter at $5.96 per day. Owing to slack in work, not because of any fault of his, he had been "laid off" and recalled to work frequently prior to 1932 in accordance with the original list fixing his seniority rights at No. 17. But under the rights of the consolidated list, fixing his seniority at No. 31, he has not been recalled since February, 1932, and drew his last pay check in April, 1932, but defendant, since said date of February, 1932, has hired *new men*, having no seniority rights whatever.

There was no evidence to the effect that anyone considered the old contract was actually terminated. The notice by which defendant claims it was terminated was not offered in evidence. No claim is made that the defendant was unaware of the protests of its employees, or of their refusal to agree to what is termed the arbitrary and unauthorized changes in their seniority rights; nor is there evidence that defendant's manager ever secured from the committee of defendant's employees, either orally or in writing, consent that the seniorities of defendant's employees might be changed to conform to the consolidated list, nor that such an agreement was made with defendant's employees either individually or as a group.

The foregoing statement of what was shown in evidence has been made at length, and in some detail, in order to set forth as fully and clearly as possible what it is that plaintiff relies upon as entitling him to recover. Other matters of evidence may be stated later in order to present in the clearest light possible the points made, and necessary to be discussed, in order to dispose of the case.

The point that the demurrer to the petition should have been sustained for the reason that a labor union cannot bind its members by its contract made with an employer, and hence an individual employee cannot enforce such a contract in a suit against the employer, does not seem to be well taken or applicable in the case at bar. This case is different from one wherein the contract is made between the union on one side and the employer on the other and in which there is nothing in the evidence to show that the employee has in any way *authorized* the contract to be made for him or for his benefit. Here the contract was made by a committee (elected for this and other purposes, by the members of local lodge No. 92 of which plaintiff was one), and the defendant employer; and after it was thus executed, a copy was sent to each yardman, including plaintiff; and from then till August 1, 1930, it was recognized as such by both the railway company and the switchmen working in defendant's yards, as hereinbefore stated. So that there is evidence of plaintiff having authorized the contract and that such contract was executed. Consequently the case of Burnetta v. Marceline Coal Co., 180 Mo. 241, cited as upholding the point made, is not applicable, for these matters were not proved in that case. Indeed, the contract relied upon in the Burnetta case is between *different* parties from the one relied upon in the case at bar. The Supreme Court did not hold that a contract, such as the one here, could not be enforced by an individual employee who was one of those for whose benefit it was made. The Supreme Court expressly say (p. 249) "there was no sufficient showing that plaintiff, in entering the employment of appellant, adopted the contract as made by the organization known as the Miners' Unions, nor was there any testimony making the contract of the miners' union *any part of the contract of the plaintiff*." (Italics ours.) The situation here with reference to the connection of plaintiff with the contract and of its being a part of the contract of employment, is vastly different; for said contract specifically speaks with reference to his employment being governed by his "seniority rights" and that the employment *could not be terminated without cause*; and from the context it is plain this means cause inhering in something in the employee, his conduct or inability to perform the work satisfactorily.

The case of Panhandle, etc., Ry. Co. v. Wilson, 55 S. W. (2d) 216, is likewise no authority for the holding that the contract in the case at bar is unenforcible for the reason given in the point now under discussion. Plaintiff, in the case cited, was a "fuel foreman," at one, or perhaps two, places, from 1920 until he was transferred to another January 1, 1929, "because of his inability to perform the duties of a fuel foreman." At Pyron, the place to which he was transferred, he was a "pumper." His seniority rights as a fuel foreman were different from his seniority rights as a pumper at Pyron. When he

went to Pyron he lost his seniority rights as a fuel foreman and commenced to acquire rights as a pumper, at least that was one of the contentions of defendant. On July 15, 1931, upon a reduction of employees, he went out of service according to his "pumper" seniority. He selected a committee to present his claim to the company and to seek re-employment, giving said committee *full authority*, so it was claimed, to represent him and make whatever agreement was necessary to secure employment. This committee agreed with the company that, if it would re-employ him, the claim for compensation for the time he was out would be waived. Plaintiff in that case was re-employed on that condition, though that was disputed and was an issue in the case. His suit was on the theory that he was entitled to seniority as a pumper *extended back* to 1920, and the jury so found, but the appellate court, the Court of Civil Appeals, at Amarillo, Texas, held there was no evidence to support the finding that plaintiff's seniority as a pumper was extended back to 1920, on the condition named, and the issue of whether the committee had the right to agree to said condition, should have been submitted as asked.

In reference to the point that a contract existed between the railway company and a trade union composed of its employees, and that it should control, the appellate court said the contract (page 218) "was not introduced in evidence and we have no information as to its provisions" further than had been set out and a certain other provision, none of which governed or settled the claim made by the employee. The appellate court also stated that it was in defendant's evidence that the company had a right to classify its employees, that this was admitted without objection and was not contradicted and also that the evidence "tended strongly to show" that he was not classified as a pumper during the time between 1920 and 1929, and that, in the face of his own statements, it was difficult to see how the jury could find to the contrary.

The appellate court further said that if the terms of the *contract* did *not* authorize the committee to accept employment for plaintiff on the condition stated, then his assent to such condition would be necessary to bind him. It was on this contention that the court made the remarks in paragraph (5) at the top of the first column on page 219 of the 55th S. W. Rep. (2d) as to individual men of a labor union not being "bound by contracts between the union and employers *unless such agreements are ratified* by the members of the union as individuals" and citing many cases in support thereof, including the Burnetta case, *supra.* The court then goes on to say that "there is no direct testimony showing that Wilson (plaintiff) as an individual ever assented to the contract," nevertheless as the case was tried on that assumption in the lower court the court said the case would

be decided on the same theory in that court and, after referring again to the fact that "the written agreement was not introduced in evidence," the court, because of the errors discussed, reversed and *remanded* the case for a new trial. Surely it would not have remanded the case if it was intending to hold that, regardless of the circumstances, a contract between a labor union and an employer could not be enforced by an individual employee.

The same is true in the case of West v. Baltimore & Ohio R. Co., 137 S. W. 654. It is not in point, for, while it *does* support the rule that individual members of a labor union are not bound by a mere contract between the union and the employer unless it is ratified by the employee as an individual, and that a contract not so ratified will not sustain an action by an individual, yet the reason why no recovery was allowed in that case was because there was "no evidence that plaintiff ratified or voted for the contract under which he claims seniority rights. He alleges that the contract was made between the brotherhood and the defendant company, and there is nothing in the record from which it can be *inferred* that he individually participated in the making of the contract, or that he ratified it." (See bottom of second column on page 655.)

The case of Hudson v. Cincinnati, etc., Ry. Co., 154 S. W. 47, is in the same category because no relation of principal and agent was shown to exist between him and the officers of the union save the *mere* fact that he was a member of the union, and this, under the established rule, is not sufficient. In the case of Chamber v. Davis, 91 So. 346, the majority of the judges of the Supreme Court of Mississippi refused to pass upon the question whether a contract between the union and the company can be enforced by an individual employee thereof, but based its decision on the fact that the suit was in *equity* and it will not decree the specific performance of such a contract.

On the other hand it is well settled that a third party for whose benefit a contract is made, may enforce it notwithstanding he is neither named therein nor is in privity to the consideration. [Crow v. Kaupp, 50 S. W. (2d) 995.] While the contract in the case at bar was signed by defendant president representing the railway company and the committee representing the defendant's yardmen, yet manifestly it was for the benefit of each and every individual employee in the yards coming within the classification of the term "yardmen" or "switchmen" therein, and the terms of said written contract were therefore a part of the contract of employment entered into by each individual yardman in accepting and entering upon the work of switching in said yards; and this was thoroughly understood by the railway company and such employees coming within the above category. Hence it cannot be successfully contended that

the suit cannot be maintained because the contract sued on was never proved and that there is no showing that plaintiff ever individually signed the same or, expressly or impliedly, gave his assent thereto. In Hall v. St. Louis-San Francisco Ry. Co., 28 S. W. (2d) 687, the court held that an agreement made by an employer of a large number of men who are members of a labor union, with the representatives of that union for and on behalf of the members thereof, is binding and that plaintiff is entitled to the benefit of provisions in his favor.

On account of the circumstances in this case, showing plaintiff's part in, and acceptance of, the contract made for his benefit and those of his fellow employees, it is not necessary, in order to hold that he can sue and recover thereon, *if the evidence warrants*, for this court to go as far as suggested in Yazoo, etc., R. Co. v. Sideboard, 133 So. 669, 671, where, after speaking of the time 200 years ago when labor unions were treated as criminal conspiracies and their struggles for full recognition in the law was beset with difficulties, the court said:

"The time has at last arrived, however, when, under patriotic and intelligent leadership, their place has become secure in the confidence of the country, and their contracts are no longer construed with hesitancy or strictness, but are accorded the same liberality, and receive the same benefits of the application of the principles of the modern law, bestowed upon other agreements which appertain to the important affairs of life. So that, although only a few years ago the courts were holding that an individual member of a labor union could not maintain an action for the breach of an agreement between an employer and the union of which the plaintiff was a member in respect to wages and other rights fixed in the contract. Hudson v. Cincinnati, etc., R. Co., 152 Ky. 711, 154 S. W. 47, 45 L. R. A. (N. S.) 184, Ann. Cas. 1915B, 98; West v. Baltimore & O. R. Co., 103 W. Va. 417, 137 S. E. 654; Burnetta v. Marceline Coal Co., 180 Mo. 241, 79 S. W. 136, these rulings have been left in the rear in the advancement of the law on this general subject, and the holdings now are that these agreements are primarily for the individual benefit of the members of the organization, and that the rights secured by these contracts are the individual rights of the individual members of the union, and may be enforced directly by the individual. [Piercy v. Louisville & N. Ry. Co., 198 Ky. 477, 248 S. W. 1042, 33 A. L. R. 322; Gulla v. Barton, 164 App. Div. 293, 149 N. Y. S. 952; Blum & Co. v. Landau, 23 Ohio App. 426, 155 N. E. 154; Cross Mountain Coal Co. v. Ault, 157 Tenn. 461, 9 S. W. (2d) 692.]"

We think the rule is correctly stated in Yazoo, etc., R. Co. v. Webb, 64 Fed. (2d) 902, 903-904, where the Federal Circuit Court of Appeals of the 5th circuit holds that a contract between the employer

and its employees *in itself* "can rarely be a subject of court action because it is incomplete. It establishes no concrete contract between the employer and any employee. . . . It is only an agreement as to the terms on which contracts of employment may be satisfactorily made and carried out. It is a mutual general offer to be closed by *specific acceptance.* (Italics ours.) When negotiated by representatives of an organization it is called collective bargaining, but ordinarily the laws of the organization, which constitute the authority of the representatives to act, do not require the individual members to serve under it, but only that if they serve they will do so under its terms and will join in maintaining them as applied to others. When the agreement is published by the managers, it becomes until abrogated the rule of that industry and any individual who thereafter continues in its employment or takes new employment takes it on the terms thereby fixed. Ordinarily, as in this case, there is no period fixed for the hirings and they are at the will of the parties, the employer having the right to discharge at any time and the employee having the right to quit. But the employment, though indefinite as to time, is a *relationship while it lasts,* and is subject to the conditions fixed in the working agreement for the industry. Thus a worker cannot be discharged for causes prohibited by the agreement, or without a hearing, if that is provided, and the agreed seniorities must be observed in promoting, laying off, or re-employing men." (Italics ours.) The Federal court then goes on to discuss the contention that employees who have not authorized its (the contract's) making are not bound, and consequently have no protection under it. And the court says that in the *mere making* of the contract this is true, but that when by its terms the contract includes the employee seeking to enforce it, and that when an employee brings into court a case concerning his individual rights, the right to enforce it is not to be denied him as a mere matter of law on the question under consideration, but is to be determined by the *evidence in the case.* Among the cases cited by the court as in the main concordant with its views, is the Burnetta case, *supra.*

In other words, the cases when carefully analyzed do not hold that contracts similar to the one here involved are held *unenforcible as a matter of law,* but that their enforcibility depends upon the evidence as to its adoption or as to what has been done in that particular case.

In the case of Piercy v. Louisville, etc., Ry. Co., 248 S. W. 1043, l. c. 1045, in speaking of the union contracts there involved, the Court of Appeals of Kentucky says, "such agreements between organizations of employees and employer are *designed primarily for the individual benefit of the members* of the organization, and not to place it within the power of the organization (or of the employer either, we may here insert) to change or modify the contract at its pleasure,

so as to affect the *individual rights* of its members theretofore secured by the agreement.'' (Italics ours.)

We again wish to state that the contract involved in the case at bar is (so far as its connection with plaintiff is concerned), much stronger than the contracts involved in the cited cases, for this contract was made by a committee elected by the employees to meet with the employer and formulate the contract which was afterwards ratified by the employees.

With reference to the point that the contract is unilateral in that the plaintiff does not agree to work for any specified time and hence the defendant is not bound to employ him longer than it chooses, it may be said, *first*, as stated in the case of Yazoo, etc., R. Co. v. Webb, 64 Fed. (2d) 904, hereinabove quoted, that while *ordinarily* the term of employment is at the will of either party, yet the employment though indefinite as to time, is a *relationship while it lasts,* and is *subject to the conditions fixed in* the contract; *second*, the contract in the case at bar provided that it should be ''in effect until March 10, 1929, and thereafter subject to thirty days' notice by either party to the other of a desire to change or terminate the same or any part thereof.'' No notice to this effect was ever given in accordance with the contract, by the notice posted in the yards of the consolidation of the work done in the yards with the Union Terminal Railway Company. The committee, the members of which were the successors of the members of the committee which originally negotiated the contract was never notified; the committee was *ignored* and never did agree to a change in, or abrogation of, the contract. In fact nothing was said anywhere in the posted notice, nor elsewhere, about the contract. So far as the evidence goes or shows, the defendant had no intention to abrogate the contract and did not do so. No notice of a desire to terminate it was served on the Grand Lodge, though both committees of the defendant's employees and of the Terminal railway did seek the advice of an experienced grand officer, its president. The two employers were, of course, not worrying or thinking about the men's seniority rights, the men only were the ones to be concerned about that.

Prior to the arrival of McQuaid, the vice president, there was no thought or discussion of consolidating the seniority lists of the men in each company into one seniority list of the men in both companies. While there is a conflict in the testimony of the defendant on one side and that in behalf of plaintiff on the other, yet the evidence in behalf of the latter sufficiently tends to show, and to authorize the jury to believe, if they did, that what McQuaid did in composing the consolidated seniority list was merely his own unauthorized act without consulting those empowered to make such change, and defendant acted upon his said unauthorized act and

made no investigation of his authority, nor made any effort to repair what was done when it learned the true fact about the matter, and although numerous complaints were made to Van Vliet, the managing officer, he declined to do anything about it at all, but told the men to look to their union for help. It may be that plaintiff did so, though there is evidence that he did not. But even if he did, there is no evidence of any *authority* in the B. R. T. to change or modify the contract so as to affect the individual rights of a member which rights were theretofore secured by the contract. [Piercy v. Louisville, etc., R. Co., 248 S. W. l. c. 1045, hereinabove quoted.] (This answers the point that as plaintiff appealed to the B. R. T. his rights are in some way affected or foreclosed.)

The *third* answer that may be made to the point that plaintiff, as an individual, cannot, as a matter of law, enforce the contract because it is unilateral in that plaintiff did not agree or bind himself to work for any certain length of time (in addition to the *second* answer concerning the provisions of the contract continuing until after notice, and no such notice was given), is that the suit is not for a *discharge* or *termination* of the employment, but for damage for not respecting his seniority rights in recalling him to work after a "lay off" on account of a lack of work to be done. So far as he knew, plaintiff was not *discharged* or his employment *relationship* terminated. He was still holding himself ready for service, though protesting all the while that his seniority rights were being violated.

The point that plaintiff is estopped from prosecuting his suit because he continued to work after his seniority was reduced, cannot prevail for the reason that it was not until after it *reasonably appeared* that he would *not* be restored to his violated rights for which he was struggling, that he could be charged with *acquiescing* in the change made in violation of his contract. Until that time came what could he do? If he quit work, he would by that act justify the wrongful change in his seniority rights, and the failure to recall him to work after being temporarily "laid off" for lack of work. He had to work in order to eat, and he had the right to hold on to his job as long as it was *reasonably possible* that his protests, and the insistence upon his rights, would be heeded.

And now we come to what, we think, is the weakness in plaintiff's right to demand an affirmance of the verdict he obtained. We have studied the evidence in the record carefully and have gone over it repeatedly; and while there is evidence tending to show that his failure to have his seniority rights recognized in accordance with the contract was not caused or justified by lack of work on account of the "depression;" but that there was sufficient work to do, for which defendant recalled to work men whose seniority was below his, and in some cases employed new men who had no senior-

ity rights whatever, the evidence of *when* this was done, by reason of an increase of work which, had his rights not been violated, would have resulted in his being recalled and put to work, is not clear. Nor is it definite and specific as to *when* or *how long* he could reasonably have hoped to be recalled to work and therefore rightfully hold himself in readiness to work; for only *to this extent* could he recover damages for loss of wages. In other words, the evidence as to the amount of his damages is, to say the least, hazy and uncertain. When to this is added the fact that plaintiff submitted his case without an instruction telling the jury what facts were necessary for it to find as a basis for a verdict in his favor, it is not perceived how a verdict of $3000 could be anything but a guess, and is doubtless excessive as defendant claims. We merely mention this failure to submit the case without an instruction advising the jury as to what theory, or state of fact, should be found in order to warrant a finding for plaintiff, as a matter which *accentuates* the lack of definite and clear evidence on the question of damages. This failure to have such an instruction cannot, of itself however, serve as a ground for a reversal and remanding the case, since this particular point was not preserved in the lower court. The objection to the three instructions that were given for plaintiff did not raise anything more than objections to what was in them, namely, as to the jury being the sole judges of the credibility of witnesses, that nine or more could return a verdict, and also the form thereof. Such objections did not advise the trial court that the failure to submit an instruction embodying any theory of plaintiff's case was complained of. And even if the motion for new trial had done this any better, that would have been too late. [Young v. Wheelock, 64 S. W. (2d) 950, 956.] Plaintiff's instructions did not even submit or contain anything in the nature of a measure of damages. And in this respect, the case was less prepared for submission to the jury, at least on the question of the amount of damages to be assessed, than was the case of Boyd v. St. Louis Transit Co., 108 Mo. App. 303, 304, which was reversed and remanded for a new trial. For this defect in the evidence, as first mentioned above, we feel that the judgment should be reversed and the cause remanded for a new trial. It is so ordered. All concur.