GEORGE W. GAINEY, ORIE M. VALENTINE, JUNIOUS HAYWOOD, JAMES H. LOLLIS, NEWLAND D. LATTIMORE, PAUL L. TEEM, NATHAN O. ANDREWS, WILLIAM FRED EVITT, WAYNE M. BARNES, THERON A. WOFFORD, HARRY B. CHASE, O. K. TOWELL, WRISTON L. DEESE, JAMES H. LEWIS, SR., HERSHELL H. DARNELL, EARNEST E. CLEMONS, JOE SCHLAGENHAUF, JAMES A. LIMBAUGH, HENRY A. REED, HARRY B. UPRIGHT, AND HARRY K. CRESS, v. LOCAL 71, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA.

(Filed 6 April, 1960.)

1. **Courts § 2—**

If a court is without jurisdiction of a proceeding it must dismiss the case.

2. **Process § 10—**

An unincorporated labor union doing business in North Carolina by performing acts for which it was formed can sue and be sued as a separate legal entity in the courts of this State, and may be served with process in the manner prescribed by statute. G.S. 1-69.1; G.S. 1-97(6).

3. **Master and Servant § 15—**

A union member is entitled to judicial relief from a union's attempting to deprive him, or depriving him, of seniority rights secured by contract with an employer, when such union action is arbitrary, fraudulent, illegal, or in excess of the union's powers.

4. **Courts § 18: Constitutional Law § 1: Master and Servant § 14—**

The National Labor Relations Act does not deprive our courts of jurisdiction to hear and determine an action by union members against the union upon allegations that in negotiating the collective bargaining agreement with the employer the union acted arbitrarily and unjustly in depriving plaintiff members of their proper seniority rights.

5. **Pleadings § 28—**

Plaintiffs may recover, if at all, only upon the cause of action set up in their complaint, and *allegata* and *probata* must concur to establish a cause of action.

6. **Master and Servant § 15— Evidence held insufficient to show that plaintiffs' seniority rights were adversely affected by the labor contract attacked.**

Plaintiffs were owner-operators of vehicles leased by a carrier, and were employees of the carrier in respect to their driving of the vehicles leased. Plaintiffs had no seniority rights under the labor contract between the carrier and the union, of which they were members, and those who had been employees with seniority lost such seniority upon becoming owner-operators. Thereafter the union negotiated a new contract precluding by economic sanction the employment of owner-operators, and in the new contract the former owner-operators remaining in

the employment were given seniority only from the effective date of the new contract. This action was instituted against the union for mandatory injunction to compel revision of the new contract so as to give plaintiffs seniority from the date of their first employment. *Held:* Nonsuit should have been entered, since at the time of the negotiation of the new contract plaintiffs had no seniority and therefore the new contract could not have deprived them of any seniority rights.

APPEAL by defendant from a judgment entered against it by *Clarkson, J.,* 18 May 1959 Civil Term, of MECKLENBURG — argued as Case No. 261 at Fall Term, 1959.

*Pierce, Wardlow, Knox & Caudle for plaintiffs, appellees.*
*Robert S. Cahoon for defendant, appellant.*

PARKER, J.   This is a summary of the parts of plaintiffs' complaint necessary for decision:

The 21 plaintiffs are now over-the-road drivers and employees of Akers Motor Lines, Inc., a common carrier by truck of commodities in interstate commerce — hereafter called Akers. Originally there were 28 plaintiffs, but Dan W. Martin and six others have removed themselves as plaintiffs, as they are no longer employees of Akers. Plaintiffs, as a group, constitute some of the oldest drivers in point of service with Akers.

The employees of Akers, including the 21 plaintiffs, have been unionized and represented for many years by the defendant, an unincorporated labor union, as their exclusive bargaining representative under the National Labor Relations Act, as amended, but until 1955 the defendant did not bargain for the owner-operators with respect to various matters.

Through the years plaintiffs were permitted to purchase, drive and maintain their own equipment, and were called owner-operators. Akers hired them as drivers, and rented their equipment.

Defendant, in order to have greater control over Akers' employees and to force Akers, and similar common carriers, to cease using owner-operators, negotiated and imposed on Akers a collective bargaining contract beginning 1 September 1955 and ending 31 August 1961, which made it economically impossible for Akers to continue its owner-operator contracts with plaintiffs. This collective bargaining contract applicable to all employees of Akers gave to plaintiffs, owner-operators, seniority as drivers from 1 September 1955, and seniority in all other respects, e. g., vacation rights, from the date of their employment by Akers. The effect of this contract, in not giving to plain-

9—252

tiffs as drivers credit for all the years they had been employees of Akers, deprived them, owner-operators, of their true seniority rights as drivers, based on the dates of their employment by Akers, in respect to lay-offs and bidding on runs and new equipment. If the plaintiffs were placed on the seniority list of drivers according to the dates of their employment by Akers, they would be near the top of the list, but having seniority as drivers only from 1 September 1955 by virtue of the 1955 collective bargaining contract, they are now near the bottom of the list. On 1 June 1956 Akers had 424 over-the-road drivers; on 1 June 1957, 360. Should there be many more lay-offs by Akers, plaintiffs will be laid off, since lay-offs are determined by seniority.

Defendant in negotiating the 1955 collective bargaining contract was required to act for all the employees of Akers, whom it represented, when in fact the interests of plaintiffs were contrary and hostile to the interests of the 322 over-the-road drivers of Akers, and defendant could not be the bargaining representative of both groups of employees. That in negotiating and consummating the 1955 collective bargaining contract with Akers, defendant arbitrarily and discriminatively and in utter disregard of the minority rights of these plaintiffs deprived them of their true seniority rights as drivers and of their constitutional rights. Akers is willing to give plaintiffs credit for their length of service with it in preparing a seniority list of drivers, but is powerless to act by virtue of the 1955 collective bargaining contract with defendant.

Plaintiffs are entitled to have the seniority list of drivers revised to give them seniority as drivers from the dates of their employment by Akers, and will be irreparably damaged if such is not done. Wherefore, plaintiffs pray for injunctive relief requiring defendant to revise its seniority list of drivers immediately, in accordance with plaintiffs' rights, and prohibiting defendant from enforcing the 1955 collective bargaining contract so long as the discrimination against plaintiffs in respect to their seniority as drivers continues.

Akers filed with the court a Bill of Intervention stating that it has no objection to the court granting to plaintiffs the relief they request, and that it stands ready and willing to carry out any order or judgment of the court in respect to the seniority rights as drivers of plaintiffs. The court entered an order allowing Akers to intervene so as to be bound by any order or judgment of the court in the case.

Plaintiffs' evidence relevant for a decision of this appeal — defendant offered none — is in substance:

Akers had owner-operators prior to its unionization by defendant

about 17 years ago. Before its unionization its employees had no seniority — seniority rights came with the union. After it was unionized defendant negotiated with it as the exclusive bargaining representative of its drivers. During this period of 17 years Akers and defendant entered into various collective bargaining contracts in respect to Akers' drivers. Prior to the 1955 collective bargaining contract between Akers and defendant, the contracts between Akers and defendant had no provision in respect to the payment by Akers to the owner-operators for the lease of their equipment — the rentals of leased equipment was set forth in individual leases between Akers and the owner-operators. The owner-operators were employees of Akers, were members of the defendant union, and paid union dues. The owner-operators were paid as drivers by Akers according to the prevailing union contract for drivers.

During the negotiations between Akers, and similar carriers, and defendant leading up to the execution of the 1955 collective bargaining contract, Akers, and other similar carriers, objected to the insertion in the 1955 contract of a provision covering the rentals to be paid for leased equipment owned by the owner-operators. James R. Hoffa, a member of the negotiating committee for defendant, said such a provision was going into the 1955 contract regardless of the objections of Akers, and the other carriers, and such a provision was incorporated in the 1955 contract as Article 28. Prior to the 1955 contract the owner-operators had no seniority as drivers — when the 1955 contract became effective on 1 September 1955, the owner-operators had seniority as drivers for Akers as of 1 September 1955. The over-the-road drivers of Akers, who were not owner-operators, had seniority as drivers before the 1955 contract — the 1955 contract did not change their seniority. After the execution of the 1955 contract Akers ceased using leased equipment owned by owner-operators, because of the added expense under the 1955 contract for the use of such equipment, except in the instance of a negro owner-operator called big Major, an employee of long years.

When Akers discontinued the use of owner-operators, these men, including the plaintiffs, chose to remain with Akers as over-the-road drivers. As far as their wages as drivers are concerned, these men make as much now as they did as owner-operators.

The men at the top of the seniority list as drivers have the choice over those beneath them on the list of trucks to drive, of preferred runs, etc.

Only five plaintiffs testified in the case. One of these, O. K. Towell, testified in substance: He was first employed by Akers as an over-

the-road driver in 1947, then became a member of defendant union, was given seniority as such a driver from that date, and has paid union dues since. In about six months he became an owner-operator. When he voluntarily became an owner-operator, he had a copy of the union contract that provided that under no circumstances can an owner-operator hold seniority. He did not understand when he became an owner-operator he would lose his seniority, though he knew his name was taken off the seniority list when he became an owner-operator. When he became an owner-operator, he did not vote in union meetings. "I knew during the ten years that I did not have seniority." His understanding was that when he gave up his truck, he would get his seniority back, but he can't "point out" where he got the assurance, it is not in the union contracts. Under the 1955 contract he now has seniority as an over-the-road driver from 1 September 1955.

Wayne M. Barnes, another plaintiff, testified in substance: He began work for Akers as an over-the-road driver in 1944, became a member of the union, paid dues, and was placed on the seniority list. Five years later he became an owner-operator. "I knew owner-operators were not on the seniority roster. I did not know that a driver lost his seniority by becoming an owner-operator." He testified on redirect-examination: "Plaintiffs' Exhibit #4, which is the 1952 contract, says that an owner or part-owner under no circumstances can hold company seniority rights. I can find nothing in the contract dealing with what are the seniority rights of an owner-operator when he ceases to be an owner-operator and drives regular company equipment."

Theron A. Wofford, another plaintiff, testified in substance: He began work for Akers as a driver in 1937. He became an owner-operator in 1951. "According to the way the contract was set up there, the union said we couldn't have any seniority during the time we owned our trucks." There were a number of union contracts. He can read, and had copies of them. It is written in the contracts that an owner-operator had no seniority. "It was in the contract. I didn't put it in there. I knew it was there." He testified on cross-examination: "Finally, in 1955 the union succeeded in getting them put owner-operators in the contract. That was the first time owner-operators got seniority. They got part of it. As a union member I think I should have seniority from the first time I went to work for the company."

Joe Schlagenhauf, another plaintiff, testified in substance: He began work as an owner-operator with Akers in 1948. He was a union member, and paid his dues. He was not permitted to vote at union

meetings. The 1952 contract stated owner-operators had no seniority. On cross-examination he testified: "I went to work for Akers at the beginning as an owner-operator. I worked for Akers, not as a leased, not as an owner-operator, back years ago and then came back in 1948. I believe that was in 1937 and 1938. There was no union then and I had no seniority because nobody had any seniority until the union came in. I quit and came back about ten years later as an owner-operator. I didn't have seniority as an owner-operator; I never did have any. I haven't lost any seniority. . . . The 1955 contract gave me seniority but I would like to say this: For years I have been there and paid my union dues and they didn't give me anything. I feel I should receive the date back to 1948."

James H. Lollis, another plaintiff, testified in substance: He was employed by Akers as an over-the-road driver in 1941. Later he voluntarily became an owner-operator. The owner-operators did not have their names on the seniority list. He testified on cross-examination: "The September 1, 1955 contract did not take anything away from me on the seniority deal. That had been taken away sometime earlier. I don't remember when. . . . If I had stayed a regular driver I would have my seniority right on down until now."

On 19 August 1957 defendant Local 71 had more than 2,600 members, each of whom was paying at least $5.00 per month dues. An initiation fee of $50.00 is collected from each member.

The following issue was submitted to the jury, and answered as appears:

"1. Did the defendant act arbitrarily, discriminately, in bad faith, or in reckless disregard of the rights of the plaintiffs in negotiating the signing the 1955 Collective Bargaining Contract for the over-the-road drivers with Akers Motor Lines, Inc., and without any reasonable basis in fact for the plaintiffs to be given seniority under the 1955 Collective Bargaining Contract on a different basis from the other over-the-road drivers of Akers Motor Lines, Inc., as alleged in the Complaint?

ANSWER: Yes."

The trial court entered a judgment ordering and decreeing as follows: One, the defendant is restrained from abiding by or carrying out the present seniority list of Akers, insofar as it affects the seniority of plaintiffs as drivers; two, the defendant is restrained from carrying out in any way the provisions of the 1955 collective bargaining contract, insofar that it does not give to plaintiffs a seniority date for all purposes as of the first date of their last continuous employment by Akers; three, defendant is required immediately to revise the

seniority list with Akers, so far as to show the seniority dates of plaintiffs for any and all purposes, to be the dates on which plaintiffs were first continuously employed by Akers, the said revised seniority list to remain in effect, and all actions based on seniority to be based thereon; four, defendant is required immediately to enter into an agreement with Akers revising the seniority list, so as to make the seniority dates of plaintiffs to be based upon the first day of their last continuous employment by Akers, instead of on 1 September 1955. The judgment further orders and decrees that the above ordered revision of the seniority list shall not in any way affect any provisions of the 1955 collective bargaining contract, except to the extent necessary to give plaintiffs full seniority rights for any and all purposes from the first date of their last continuous employment by Akers.

Defendant assigns as error the overruling of its demurrer to the complaint. Its demurrer is based, primarily, on two grounds: one, the court has no jurisdiction of the subject matter of the action, for the reason, that if the complaint sets forth any legal claim at all, it is within the exclusive jurisdiction of the National Labor Relations Board and the federal courts; and two, the complaint does not state facts sufficient to constitute a cause of action. Defendant also assigns as error the denial of its motion for judgment of nonsuit made at the close of plaintiffs' evidence. Defendant's argument and citation of authorities in its brief in respect to the overruling of its demurrer to the complaint are by reference repeated, with no more, where, in its brief, it has brought forward the denial of its motion for judgment of nonsuit.

It is a universal principal as old as the law is that the proceedings of a court without jurisdiction are a nullity. If a court has no jurisdiction, it can only dismiss the case. *Branch v. Houston,* 44 N.C. 85; *Baker v. Varser,* 239 N.C. 180, 79 S.E. 2d 757; 14 Am. Jur., Courts, §167. The first question presented for decision is to determine whether the trial court had power to enter upon the inquiry, and to render a judgment or decree binding upon the litigant parties.

An unincorporated labor union doing business in North Carolina by performing acts for which it was formed can sue and be sued as a separate legal entity in the courts of this State, and may be served with process in the manner prescribed by statute. G.S. 1-69.1; G.S. 1-97(6); *Martin v. Brotherhood,* 248 N.C. 409, 103 S.E. 2d 462, (a former appeal in this case concerned alone with alleged service of process on defendant); *Construction Co. v. Electrical Workers Union,* 246 N.C. 481, 98 S.E. 2d 852; *Stafford v. Wood,* 234 N.C. 622, 68 S. E. 2d 268.

In *International Asso. Machinists v. Gonzales,* 356 U.S. 617, 2 L. Ed. 1018, a labor union member, claiming to have been expelled from membership in the International Association of Machinists and its Local 68 in violation of his rights under the constitution and by-laws of the union, was ordered reinstated, and awarded damages for lost wages and physical and mental suffering. The judgment was affirmed by the California District Court of Appeal, First District, Division One (142 Cal. App. 2d 207, 298 P. 2d 92), and the Supreme Court of California denied rehearing. On *certiorari* to the California District Court of Appeal, the U. S. Supreme Court affirmed the judgment below. The majority opinion of the Court has covered the question confronting us so comprehensively that we quote from it *in extenso:*

"As *Garner v. Teamsters C. & H. Local Union,* 346 U.S. 485, 98 L. Ed. 228, 74 S. Ct. 161, could not avoid deciding, the Taft-Hartley Act undoubtedly carries implications of exclusive federal authority. Congress withdrew from the States much that had theretofore rested with them. But the other half of what was pronounced in *Garner* — that the Act 'leaves much to the states,' — is no less important. See 346 U.S., at 488. The statutory implications concerning what has been taken from the States and what has been left to them are of a Delphic nature, to be translated into concreteness by the process of litigating elucidation. See *Weber v. Anheuser-Busch, Inc.* 348 U.S. 468, 474-477, 99 L. Ed. 546, 554, 555, 75 S. Ct. 480.

"Since we deal with implications to be drawn from the Taft-Hartley Act for the avoidance of conflicts between enforcement of federal policy by the National Labor Relations Board and the exertion of state power, it might be abstractly justifiable, as a matter of wooden logic, to suggest that an action in a state court by a member of a union for restoration of his membership rights is precluded. In such a suit there may be embedded circumstances that could constitute an unfair labor practice under § 8(b) (2) of the Act. In the judgment of the Board, expulsion from a union, taken in connection with other circumstances established in a particular case, might constitute an attempt to cause an employer to 'discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership. . . .' 61 Stat. 141, 29 U.S.C. § 158(b) (2). But the protection of union members in their rights as members from arbitrary conduct by unions and union officers has not been

undertaken by federal law, and indeed the assertion of any such power has been expressly denied. The proviso to § 8(b) (1) of the Act states that 'this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein. . . .' 61 Stat. 141, 29 U.S.C. § 158(b) (1). The present controversy is precisely one that gives legal efficacy under state law to the rules prescribed by a labor organization for 'retention of membership therein.' Thus, to preclude a state court from exerting its traditional jurisdiction to determine and enforce the rights of union membership would in many cases leave an unjustly ousted member without remedy for the restoration of his important union rights. Such a drastic result, on the remote possibility of some entanglement with the Board's enforcement of the national policy, would require a more compelling indication of congressional will than can be found in the interstices of the Taft-Hartley Act. See *United Constr. Workers v. Laburnum Constr. Corp.* 347 U.S. 656, 98 L. Ed. 1025, 74 S. Ct. 833.

"Although petitioners do not claim that the state court lacked jurisdiction to order respondent's reinstatement, they do contend that it was without power to fill out this remedy by an award of damages for loss of wages and suffering resulting from the breach of contract. No radiation of the Taft-Hartley Act requires us thus to mutilate the comprehensive relief of equity and reach such an incongruous adjustment of federal-state relations touching the regulation of labor. The National Labor Relations Board could not have given respondent the relief that California gave him according to its local law of contracts and damages. Although if the unions' conduct constituted an unfair labor practice the Board might possibly have been empowered to award back pay, in no event could it mulct in damages for mental or physical suffering. And the possibility of partial relief from the Board does not, in such a case as is here presented, deprive a party of available state remedies for all damages suffered. See *International Union, United A.A.A.I. W. v. Russell*, 356 U.S. 634, 2 L. Ed. 2d 1030, 78 S. Ct. 932. If, as we held in the *Laburnum* case, certain state causes of action sounding in tort are not displaced simply because there may be an argumentative coincidence in the facts adducible in the tort action and a plausible proceeding before the National Labor Relations Board, a state remedy for breach of contract also ought not be displaced by such evidentiary coincidence when the possibility of conflict with federal policy is similarly remote. The possibility of conflict from the court's award of damages in the present case is no greater

than from its order that respondent be restored to membership. In either case the potential conflict is too contingent, too remotely related to the public interest expressed in the Taft-Hartley Act, to justify depriving state courts of jurisdiction to vindicate the personal rights of an ousted union member. This is emphasized by the fact that the subject matter of the litigation in the present case, as the parties and the court conceived it, was the breach of a contract governing the relations between respondent and his unions. The suit did not purport to remedy or regulate union conduct on the ground that it was designed to bring about employer discrimination against an employee, the evil the Board is concerned to strike at as an unfair labor practice under § 8(b) (2). This important distinction between the purposes of federal and state regulation has been aptly described: 'Although even these state court decisions may lead to possible conflict between the federal labor board and state courts they do not present potentialities of conflicts in kind or degree which require a hands-off directive to the states. A state court decision requiring restoration of membership requires consideration of and judgment upon matters wholly outside the scope of the National Labor Relations Board's determination with reference to employer discrimination after union ouster from membership. The state court proceedings deal with arbitrariness and misconduct vis-a-vis the individual union members and the union; the Board proceeding, looking principally to the *nexus* between union action and employer discrimination, examines the ouster from membership in entirely different terms.' Isaacson, Labor Relations Law: Federal Versus State Jurisdiction, 42 ABAJ 415, 483."

A collective bargaining agent certified by the National Labor Relations Board is authorized to negotiate questions of seniority. *Ford Motor Co. v. Huffman*, 1953, 345 U.S. 330, 97 L. Ed. 1048. In that case petitioner, an employee-union member, sought to have declared invalid a collectively bargained agreement whereby his employer allowed employees seniority credit for both pre-employment and post-employment military service. In the course of its opinion for a unanimous Court holding the agreement was in all respects valid, the Court stated:

"That the authority of bargaining representatives, however, is not absolute is recognized in *Steele v. Louisville & N. R. Co.*, 323 U.S. 192, 198, 199, 89 L. Ed. 173, 180, 181, 65 S. Ct. 226, in connection with comparable provisions of the Railway Labor Act. Their statutory obligation to represent all members of an appro-

priate unit requires them to make an honest effort to serve the interests of all of those members without hostility to any. . . . Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion. . . . Nor does anything in that Act (National Labor Relations Act) compel a bargaining representative to limit seniority clauses solely to the relative lengths of employment of the respective employees."

*Coley v. R. R.*, 1942, 221 N.C. 66, 19 S.E. 2d 124, was an action by a number of employees of the A. C. L. R. R. Co., for mandatory injunction to compel revision of seniority roster or to restrain defendants from putting into effect roster as published. On the final hearing the restraining order, theretofore temporarily issued and continued to the hearing, was dissolved, and the action dismissed as in case of nonsuit. The judgment was upheld by this Court, and in the course of its opinion it said:

"The Brotherhood had the power, by agreement with the Railroad Company, to create seniority rights for 'the craft or class of carmen, their helpers and apprentices, employees of the Atlantic Coast Line Railroad Company.' Citing authority. By the same token, and in like manner, it had the power, in good faith, to modify these rights in the interest of the larger good. Annotation 117 A.L.R. 823. In an action, as here, by individual beneficiaries of the original contract to restrain any such modification, it is necessary to allege and to prove that the Brotherhood acted arbitrarily or in reckless disregard of the plaintiffs' rights. The present record falls short of the prerequisites in this respect."

These decisions are to the effect that a union member is entitled to judicial relief from a union's attempting to deprive him, or depriving him, of seniority rights secured by contract with an employer, when such union action is arbitrary, fraudulent, illegal, or in excess of the union's powers. *Piercy v. Louisville & N. R. Co.*, 198 Ky. 477, 248 S.W. 1042, 33 A.L.R. 322; *George T. Ross Lodge v. Brotherhood of R. Trainmen*, 191 Minn. 373, 254 N.W. 590; *McCoy v. St. Joseph Belt R. Co.*, 229 Mo. App. 506, 77 S.W. 2d 175; *Dooley v. Lehigh Valley R. Co.*, 130 N.J. Eq. 75, 21 A. 2d 334, (affirmed in 131 N.J. Eq. 468, 25 A. 2d 893); *Evans v. Louisville & N. R. Co.*, 191 Ga. 395, 12

S.E. 2d 611; *Grand International Brotherhood of Locomotive Engineers v. Mills,* 43 Ariz. 379, 31 P. 2d 971. See 31 Am. Jur., Labor, §71; Anno. 142 A.L.R. 1067, 1068; 175 A.L.R. 520.

It is our opinion, and we so hold upon the authority of the reasoning and statements in the majority opinion *International Asso. Machinists v. Gonzales, supra,* that the trial court had jurisdiction over the parties and the subject matter of this action.

We now come to a consideration of defendant's motion for judgment of nonsuit, the denial of which by the trial court is assigned as error by defendant.

Plaintiffs' action, as alleged in their complaint, is to compel by injunction defendant to revise its seniority list of over-the-road drivers with Akers so as to give them seniority as drivers from the date of their last continuous employment by Akers, instead of from 1 September 1955 as provided for in the 1955 collective bargaining contract, and to enjoin defendant from enforcing its seniority list of over-the-road drivers with Akers until such revision by it in plaintiffs' favor is made.

Plaintiffs' evidence clearly shows these facts: When the 1955 collective bargaining contract was made between Akers and the defendant as the exclusive bargaining representative of its members, all of the over-the-road drivers employed by Akers had seniority rights as drivers fixed by prior union contracts with Akers. Prior to the execution of the 1955 collective bargaining contract, none of the plaintiffs, owner-operators, had any seniority rights according to the union contract with Akers then in force, and also according to prior union contracts with Akers effective as soon as they became owner-operators. Wayne M. Barnes, one of the plaintiffs, testified: "Plaintiffs' Exhibit #4, which is the 1952 contract, says that an owner or part-owner under no circumstances can hold company seniority rights. I can find nothing in the contract dealing with what are the seniority rights of an owner-operator when he ceases to be an owner-operator and drives regular company equipment." Joe Schlagenhauf, another plaintiff, began work with Akers as an owner-operator. He testified: "I didn't have seniority as an owner-operator; I never did have any. I haven't lost any seniority. The 1955 contract gave me seniority." James H. Lollis, another plaintiff, testified: "The September 1, 1955 contract did not take anything away from me on the seniority deal. That had been taken away sometime earlier. I don't remember when. . . . If I had stayed a regular driver I would have my seniority right on down until now." O. K. Towell, another plaintiff, testified in substance that when he voluntarily became an owner-operator, he had a copy of the

union contract that provided that under no circumstances can an owner-operator hold seniority. Towell testified: "I knew during the ten years" (i. e., when he was an owner-operator) "that I did not have seniority." Theron A. Wofford, another plaintiff, testified: "According to the way the contract was set up there, the union said we couldn't have any seniority during the time we owned our trucks." Wofford also testified in substance: There were a number of union contracts. He can read, and had copies of them. It is written in the contracts that an owner-operator had no seniority. There is no evidence in the record that defendant union prevented any of the plaintiffs from reading the union contracts prior to 1955, or misled its members in any way in respect to those contracts stating that under no circumstances could any owner-operator have any seniority. When plaintiffs became owner-operators, or began as an owner-operator with Akers, their names were not on the seniority roster under the union contracts. Every plaintiff, so far as the evidence shows, who began work as an over-the-road driver with Akers, had proper seniority rights by union contracts, after Akers was unionized, and when such an over-the-road driver voluntarily chose to become an owner-operator with Akers, he lost all seniority rights under the union contracts. The loss of all of his seniority rights was his voluntary and free choice. Before Akers was unionized its employees had no seniority rights — seniority rights for its employees came with defendant union, and existed solely by virtue of union contracts made between the defendant union and Akers. If the defendant union had negotiated the 1955 contract with Akers so as to have given plaintiffs, who according to union contracts with Akers had no seniority rights as drivers with Akers, seniority rights as drivers with Akers from the date of their last continuous employment with Akers, as plaintiffs contend it should have, or if this Court should uphold the judgment of the trial court, as plaintiffs contend should be done, this would be to deprive the great majority of over-the-road drivers of Akers of their seniority rights to the extent that plaintiffs would have been or are given seniority rights as drivers ahead of them, which seniority rights of these over-the-road drivers are fixed by the 1955 contract and prior union contracts between Akers and defendant union.

If plaintiffs are to succeed at all, they must do so on the case set up in their complaint. *Sale v. Highway Commission*, 238 N.C. 599, 78 S.E. 2d 724, and the cases there cited. *Allegata* without *probata* is insufficient. Both must concur to establish a cause of action. *Aiken v. Sanderford*, 236 N.C. 760, 73 S.E. 2d 911; *Coley v. R. R., supra*.

The 1955 collective bargaining agreement made between defendant

union and Akers deprived plaintiffs of no seniority rights, for the reason that their evidence clearly shows that at the time this contract was executed, plaintiffs had no seniority rights. The trial court erred in denying defendant's motion for judgment of nonsuit.

The judgment below is

Reversed.